IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MAURICE CRUZ-WEBSTER, | § | |
| | § | No. 139, 2016 |
| Defendant Below, | § | |
| Appellant, | § | Court Below—Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Cr. ID No. 1501005498 |
| STATE OF DELAWARE, | § | |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: January 25, 2017
Decided: February 2, 2017

Before **HOLLAND**, **VAUGHN**, and **SEITZ**, Justices.

### O R D E R

This 2nd day of February, 2017, it appears to the Court, as follows:

(1) At the conclusion of a seven-day trial in January 2016, the jury found the defendant below, appellant Maurice Cruz-Webster guilty of Murder First Degree, Reckless Endangering First Degree, and two counts of Possession of a Firearm During the Commission of a Felony ("PFDCF"). The Superior Court sentenced him to Level V incarceration for his natural life on the conviction for First Degree Murder, plus an additional 15 years of incarceration for the remaining charges. This is Cruz-Webster's direct appeal.

(2) Cruz-Webster raises four arguments on appeal. First, he argues that the prosecutor engaged in misconduct that unfairly affected the outcome of the trial by

impermissibly eliciting a police officer's opinion that he did not believe the victim was being truthful. Second, and in the alternative, Cruz-Webster argues that if the prosecutor did not engage in misconduct, then the police officer's improper credibility opinion constituted a violation of his federal due process right to a fair trial. Third, Cruz-Webster contends that the prosecutor engaged in misconduct when he vouched for Cooper's credibility by eliciting testimony on the truthfulness provisions of Cooper's Witness Protection Agreement with the State. Fourth, Cruz-Webster contends that the State's playing of Cooper's pretrial video statement pursuant to 11 *Del. C.* § 3507 was improper because Cooper was not a turncoat witness and the only purpose served by playing the tape was to bolster his testimony.

(3)     We have concluded that all of Cruz-Webster's claims are without merit. Therefore, the judgment of convictions by the Superior Court must be affirmed.

(4)     On January 9, 2015, Kyrell Lewis, who was also known as "Bubba," was shot to death in front of his house in New Castle, Delaware. The recitation of facts in the Order is taken from the Opening Brief filed by Cruz-Webster in this appeal.

(5)     At 6:37 p.m. on January 9, 2015, Lewis received a text message stating "Yo, I'm out here." The message was purportedly sent to Lewis by Cruz-Webster. The text was the final text message in a string of texts that started earlier that night.

2

The gist of the messages was a demand that Lewis stop "playing" him over an alleged unpaid debt.

(6) Also at that time, Lewis met with an individual outside of his house where an argument ensued. The testimony varied about the number of individuals present during the argument. The argument became heated, and neighbors overheard and watched as the argument escalated. An individual, alleged to be Cruz-Webster, was angry and yelling at Lewis until the argument subsided. As the individual started to walk away, Lewis said something which apparently infuriated that individual, causing him to run up to Lewis and fire four shots at him, and three more shots as he ran away.

(7) Lewis was struck by the gunshots and stumbled inside of his residence and directed his aunt, Phyllis Shaw, to call the police. Lewis spoke to the 911 dispatcher and stated he did not know who shot him. Shortly thereafter, Lewis told Patrolman Barnes that it was two black men in all black clothing who shot him. He then told Patrolman Townsend that he was shot by an unknown individual. Finally, he told EMT Brian Reeder that he just heard four pops.

(8) Shaw resided near the crime scene and was present at 6:37 p.m. She was in her front bedroom when she heard Lewis walk out of the house. She heard Lewis arguing with another person and looked out the window. She stated that Lewis was arguing with Cruz-Webster, whose nickname was "Mere." Cruz-Webster

3

was wearing a purple zip-up hoodie and a gray pair of sweatpants. His head was covered by the hood.

(9) Shaw walked away from the window but the arguing continued. She briefly looked out the window again and observed the argument continue. She walked away from the window briefly and heard gunshots. She went downstairs and observed Lewis come inside and state that he had been shot. She called 911 at 6:48 p.m. Shaw did not see the shooting or ever see Cruz-Webster with a gun.

(10) Shaw took possession of Lewis's cell phone and brought it to the hospital where it was provided to the police. Detective Jamante Cooper extracted information from the phone, including the call log, text messages, and contact information. The same phone number from which Lewis received the text message was listed in his phone as "Mersey." The following exchange took place between Mersey and Lewis. At 6:27 p.m., Mersey texted Lewis, "When you fucking make nigga stop playing with me FR [for real]." At 6:28 p.m. Lewis responded, "You playing with you, not me. HMP [Hit me up]." Thirty seconds later, a text from Mersey stated, "What?" "WYA?" Lewis responded "Crib." A text from Mersey stated, "ART [All right]. I'm about there. Come out." At 6:37 p.m., a text from Mersey stated, "Yo, I'm out here."

(11) Joe Trawicki, a representative from Sprint, and Brian Dailey said that Maurice Webster is the subscriber for the cell phone number that was texting Lewis.

4

Dailey also conducted cell tower analysis for that cell phone number. Dailey concluded that calls made from that phone placed it in the general area at the time of the shooting, but that a precise location was unable to be established because of the limitations of cell tower analysis.

(12) Nora Luevano and Jorge Lujan were present at a nearby house at the time of the shooting. They had gone out for dinner and when they arrived home they observed Lewis arguing with another man in Lewis's driveway. There is one townhouse in between their location and the crime scene. They went into the house to watch TV. When the argument continued, Luevano decided to go upstairs to the spare bedroom to see what was going on. She saw her neighbor and the other man arguing. The other individual was wearing white pants. A third man walked up and kind of stood behind them. She saw that the man who was arguing with Lewis said something. This caused the man he was arguing with to turn around, run back at him, and fire gunshots at Lewis from about three and one half feet away. He then fired more shots as he was running away.

(13) Luevano was certain that the man who shot Lewis was the same person who was arguing with him in the driveway. Luevano testified that the lighting conditions were not good enough to see the shooter's face. She said the shooter was wearing white pants, not sweatpants. He was wearing a light jacket, but no hood on his head. She was not able to identify Cruz-Webster as the shooter.

(14) Jorge Lujan heard the argument but did not see the shooting. He was not able to identify Cruz-Webster as the individual who was arguing with Lewis.

(15) Douglas Pressley was at a nearby residence, sitting on his car talking to a friend on his cell phone, when the shooting occurred. He heard arguing about a sporting event prior to the shooting but did not observe the actual shooting. One of the bullets pierced Pressley's pant, but did not cause injury.

(16) Pressley was unable to identify Cruz-Webster as one of the individuals at the victim's house at the time of the argument or shooting. He also testified that he observed four or five people present at the scene during the argument with Lewis. Pressley told Officer Zolonowski that he saw Lewis arguing with a group of black males and a white male with a red beard and red clothing. Pressley first told Detective Sendek that he saw four or five males at the scene, but later said it was five or six males.

(17) Fawwaz Mohammed is a clerk and manager at Newcastle Market, a local convenience store. The police took a surveillance video from him which purportedly shows Cruz-Webster in the store buying minutes for his phone on the date of the offense. The video purportedly showed Cruz-Webster with pants matching Luevano's description of the shooter. The time on the receipt for the minutes purchased did not correspond to the time on the videos. Mohammed stated that the dates and times on the video were not accurate or reliable.

(18)  No gun was recovered. DNA was recovered from the shells located at the scene, but no fingerprints were lifted from the shells. Paul Gilbert of the Division of Forensic Science performed a DNA analysis of the swabs from the shells. His analysis disclosed that the swabs from the shell casings were consistent with being a mixture of at least two individuals, at least one of which was a male. The DNA of the major and minor contributors were not consistent with the known DNA profile of Cruz-Webster.

(19)  Cruz-Webster was arrested the next day and was taken to Howard R. Young Correctional Institute where he was incarcerated in a pretrial intake pod, Pod 1-A. On January 20, 2015, Donald Cooper, a convicted felon, was arrested for a violation of probation and was placed in the same pod with Cruz-Webster. They were on the same pod for about 14 days. Cooper claimed that Cruz-Webster told him: "Bub owed [Cruz-Webster] $80 for some weed and he had to do it. He wasn't going to fight Bub, he said—and he was scared to fight Bub, something like that. And he said that he hit [Bub] with a 'nine' [a 9 mm handgun]. He said the 'nine' was still out there." In February 2015, Cooper spoke to Detective Ziemba and provided him with the information about what Cruz-Webster had told him.

(20)  Cruz-Webster argues that prosecutorial misconduct occurred during the testimony of Patrolman Reginald Barnes. At trial, the State called Barnes as a witness. On direct examination, Barnes testified that he responded to Lewis's

7

address for a "shots fired" call. He further testified that when he walked into the house the victim, Lewis, was conscious, alert, and speaking to him. Barnes stated that "I asked him what happened tonight, who shot you," and "I asked him several times, the question." Barnes testified that Lewis's response was that he was standing on the front steps of his residence and two black males wearing all black shot him and ran towards Memorial Drive.

(21) On cross-examination, defense counsel questioned Barnes with regards to asking Lewis multiple times what had happened. Defense counsel repeated Barnes's direct testimony by saying that he asked Lewis multiple times what happened and Lewis was consistent each time in responding that two black males wearing all black shot him. Barnes agreed that Lewis was consistent. Defense counsel also asked whether Lewis gave any other details, such as names, to which Barnes responded no. On redirect, the State asked "why did you ask him multiple times?" to which Barnes responded, "I didn't believe him, essentially. They didn't know-" Defense counsel objected immediately.

(22) At sidebar, defense counsel stated his belief that the question was asked to invite the officer to comment on whether he believed Lewis, and asked the trial judge *"to strike the question and answer and instruct the jury to disregard it."* The prosecutor explained, "I did not ask that question to invite that response. I believe[d] that his response was going to be–to get more details because he did not give him

8

details . . . . And that's important because I think the inference from that is that he wasn't being truthful." The trial judge stated, "I don't think the prosecution intended to elicit that response. Let me make that perfectly clear. The question is now what action should the court take to make sure the defendant does have a fair trial without inappropriate comments . . . . I'm going to give a curative . . . ." The Superior Court then provided a curative instruction, as follows:

> Ladies and gentlemen of the jury, I'm going to instruct you to disregard the police officer statement about his disbelief of what the Defendant told him. Do you understand? What the police officer thinks about the credibility of a witness is not relevant because you are the finders of fact in this case. You determine the credibility of the witness and evidence. That's your role. Do you understand?

(23) Cruz-Webster's first argument is that the prosecutor intentionally elicited the inadmissible testimony from Barnes and that the *Hughes* factors require reversal.[1] The Superior Court's finding that the prosecutor did not intend to elicit the testimony is a credibility assessment that is entitled to deference on appeal and, therefore, is dispositive on the issue of alleged prosecutorial misconduct.

(24) Alternatively, Cruz-Webster's second argument is that, even if there was no intentional misconduct, the prosecutor deprived him of his federal due process right to a fair trial by eliciting "Barnes' opinion that he did not believe the victim was being truthful when he stated he did not know who shot him." The record

---

[1] *Hughes v. State*, 437 A.2d 559, 571 (Del. 1981).

reflects that defense counsel specifically requested a curative instruction rather than a mistrial. The trial judge granted the requested relief.

(25) This Court reviews constitutional claims of error *de novo*, and reviews denials of motions for a mistrial based on a witness's unsolicited, improper testimony for an abuse of discretion or the denial of substantial right.[2] However, this record reflects the proper standard of review is plain error because Cruz-Webster did not move for a mistrial.[3]

(26) Cruz-Webster's attorney made a strategic decision to request a curative instruction and not a mistrial. Cruz-Webster now challenges his convictions on the basis of the testimony for which he requested and received a curative instruction. Cruz-Webster has failed to establish that Barnes's testimony violated his federal due process right to a fair trial. The trial judge did not abuse her discretion or commit plain error by not *sua sponte* ordering a mistrial.[4]

(27) Cruz-Webster's third argument on appeal is that the prosecutor engaged in misconduct when he vouched for Cooper's credibility by eliciting testimony on the truthfulness provisions of Cooper's Witness Protection Agreement with the State. Cruz-Webster raised the issue of the prosecution's ability to reference the

---

[2] *Pena v. State*, 856 A.2d 548, 550 (Del. 2004).
[3] Del. Supr. Ct. R. 8 ("Only questions fairly presented to the trial court may be presented for review."); *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986) (internal citations omitted).
[4] *Hardin v. State*, 840 A.2d 1217, 1220 (Del. 2003).

provisions of the "testify truthfully" language of Cooper's Witness Protection Agreement by a motion *in limine* before Cooper took the stand. The trial judge responded, "I don't think that's unfair for them to ask, depending on what you ask." The trial judge warned defense counsel about his questioning on the subject, stating: "Just be very wary because if you open the door there's no shutting it."

(28) During Cruz-Webster's cross-examination of Cooper, defense counsel questioned Cooper about his motivation for cooperating with the prosecution. Defense counsel specifically referenced Cooper's written agreement with the State, marking it as Defense Exhibit A for Identification and showing it to Cooper. When he pressed Cooper about whether Cooper expected anything in return for his testimony other than what was spelled out in the agreement, Cooper responded, "That's it. I'm not doing this for their sake, I'm doing this because it's [a] good thing to do."

(29) Defense counsel then asked questions implying that was not true. Defense counsel asked if "the State's agreeing that they are going to file a motion for substantial assistance on our behalf after this to reduce your probation so you can leave the State?" Defense counsel's cross-examination of Cooper left the jury with the impression that Cooper's testimony was the result of the benefits he was receiving from the State.

(30) On redirect, the State asked Cooper questions that provided more detail about Cooper's Witness Protection Agreement. The prosecutor directed Cooper's attention to paragraph one of the agreement, asked him if he read it before he signed it, asked if he agreed to it, and then asked him about its provisions. Despite multiple opportunities to object to this line of questioning, defense counsel did not. Cooper read the provision of the agreement that required him "[t]o cooperate fully and truthfully with the investigation or prosecution of the State of Delaware versus Maurice Cruz-Webster and to testify truthfully if called [as] a witness by any part[y] during a trial or in any part [sic] involving these matters." The prosecutor then asked Cooper to read other provisions of the agreement including that the State's obligation to file a substantial assistance motion within 60 days of trial was not "dependent upon any particular result or outcome in the criminal matters."

(31) The record reflects that the trial judge decided not to rule on the motion *in limine* but to wait until there was an objection in the context of specific testimony. In the absence of an objection to Cooper's redirect testimony, Cruz-Webster's third claim will not be reviewed on appeal because the record does not reflect any plain error.[5]

---

[5] Del. Supr. Ct. R. 8 ("Only questions fairly presented to the trial court may be presented for review.").

12

(32) Finally, for the first time on appeal, Cruz-Webster contends that playing Cooper's recorded statement to police for the jury constitutes reversible error. On direct examination, Cooper testified that he was interviewed by Detective Ziemba about information that Cruz-Webster told Cooper during their incarceration together in the same pod. The State then offered a recorded Section 3507 statement of Cooper through Ziemba, who interviewed him, and played the recording for the jury.

(33) When a defendant has failed to preserve an issue for appeal, this Court will apply the plain error standard of review.[6] At no point did defense counsel object to playing the tape on any basis. Cruz-Webster acknowledges that he did not preserve the issue for appeal.[7] The record reflects no plain error. Accordingly, Cruz-Webster waived his claim on appeal that Cooper's Section 3507 statement should not have been played by failing to fairly present it to the Superior Court.[8]

NOW, THEREFORE, IT IS HEREBY ORDERED that the Superior Court's judgment of convictions is affirmed.

BY THE COURT:

_Randy J Holland_
Justice

---

[6] *Id.*

[7] Cruz-Webster also acknowledges that he did not preserve his appellate challenges to the State's closing arguments.

[8] Del. Supr. Ct. R. 8 ("Only questions fairly presented to the trial court may be presented for review.").

13