# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE      )
                           )
     v.                    )    ID No. 1501005498
                           )
MAURICE CRUZ-WEBSTER,  )
                           )
    Defendant.         )

## MEMORANDUM OPINION

Date Submitted: April 16, 2020
Date Decided: August 31, 2020

*Upon Defendant's Amended Motion for Postconviction Relief:* **DENIED.**

Christopher S. Koyste, Esquire, Law Office of Christopher S. Koyste LLC, 709 Brandywine Boulevard, Wilmington, Delaware 19809, Attorney for Defendant Maurice Cruz-Webster.

Sean P. Lugg, Deputy Attorney General, Delaware Department of Justice, 820 N. French Street, Wilmington, Delaware 19801, Attorney for the State.

**Jurden, P.J.**

# I. INTRODUCTION

Before the Court is Defendant Maurice Cruz-Webster's Amended Motion For Postconviction Relief ("Motion").[1]

Defendant alleges six ineffective assistance of counsel claims against Trial Counsel: (1) failure to properly object to the State vouching for the credibility of a witness; (2) failure to request a mistrial for improper opinion testimony; (3) failure to make a proper authentication objection to the admission of store surveillance videos and receipts; (4) failure to request the removal of a juror for misconduct; (5) failure to object to the admission of a witness's videotaped statement pursuant to 11 *Del. C.* § 3507; and (6) failure to investigate and call a rebuttal witness.[2] In addition, Defendant claims cumulative error.[3] For the following reasons, Defendant's Motion is **DENIED**.

---

[1] On June 15, 2017, pursuant to Superior Court Criminal Procedure Rule 61, Defendant filed *pro se* motions for Postconviction Relief and Appointment of Counsel. D.I. 72; D.I. 73. The Court appointed counsel, and on October 8, 2018, Defendant, through counsel, filed this Motion. D.I. 99 ("Motion"). Because Defendant's Motion alleged ineffective assistance of counsel claims, the Court ordered Defendant's trial counsel, Michael W. Modica, Esq., ("Trial Counsel") to respond by affidavit to those allegations. *See* D.I. 105 ("First Aff."). On November 20, 2019, the Court asked Trial Counsel to file a supplemental affidavit addressing the Court's questions relating to Juror Number 7. D.I. 115. Trial Counsel filed his supplemental affidavit (titled "Amended Affidavit of Michael W. Modica, Esq.") on March 9, 2020. D.I. 119 (hereinafter "Suppl. Aff."). Trial Counsel explains he supplemented his First Affidavit by adding testimony with respect to Ground Four – Removal of a Juror. *See id.*

[2] Motion at i–ii.

[3] *Id.* at ii.

## II. BACKGROUND

In January 2016, after a seven-day jury trial, Defendant was found guilty of Murder First Degree, Reckless Endangerment First Degree, and two counts of Possession of a Firearm During the Commission of a Felony.[4] Defendant was sentenced to life imprisonment plus 15 years at Level V.[5]

Defendant's convictions stem from a January 9, 2015 shooting resulting in the death of Kyrell Lewis. At approximately 6:30 p.m. that evening, Lewis received a text message from Defendant stating, "Yo, I'm out here."[6] Shortly after that text

---

[4] D.I. 46.

[5] D.I. 54. On March 11, 2016, Defendant was sentenced as follows: for Murder First Degree, life imprisonment; for Reckless Endangering First Degree, five years at Level V, suspended after three years; and for each count of Possession of a Firearm During the Commission of a Felony, six years at Level V.

[6] D.I. 59 ("Jan. 6, 2016 Trial Tr.") at 24–35. The following is a text message exchange between Lewis and Defendant leading up to the events on January 9, 2015:

| | |
|---|---|
| DEFENDANT: | When you fucking make nigga stop playing with me FR [for real]. |
| LEWIS: | You playing with you, not me. HMP [Hit me up]. |
| DEFENDANT: | What? WYA [Where you at]? |
| LEWIS: | Crib. |
| DEFENDANT: | ART [All right]. I'm about be there. Come out. |
| | Yo, I'm out here. |

*Id.* At trial, Joe Trawicki, a records custodian from Sprint, testified that the number listed in Lewis' phone as "Mersey" belonged to Defendant and that number was texting Lewis' phone prior to the shooting. D.I. 57 ("Jan. 7, 2016 Trial Tr.") at 27–48. Brian Dailey, a special investigator for the Delaware Department of Justice, conducted a cell tower analysis for the phone number texting Lewis' phone. He concluded that calls made from that phone placed it in the general vicinity of the shooting at the time it occurred, but a precise location could not be established because of the limitations of cell tower analysis. *Id.* at 48–77.

3

exchange, Lewis met with Defendant outside his house where an argument ensued.[7] The argument became heated, and neighbors overheard and watched as the argument escalated.[8] Eventually, the argument subsided, but as Defendant started to walk away, Lewis said something which infuriated Defendant, causing him to run up to Lewis and fire four shots at him and three more shots as he ran away.[9] Ultimately, Lewis died from internal injuries caused by the gunshot wounds.

At trial, the State presented the testimony of multiple witnesses, including Lewis' aunt, a neighbor who witnessed the shooting, the responding police officers and special investigators, the medical examiner, physicians who treated Lewis, a senior forensic DNA analyst, and Defendant's podmate at Howard R. Young Correctional Institution.[10]

---

[7] Lewis' aunt, Phyllis Shaw, resided with Lewis and saw Lewis and Defendant arguing that night outside their house right before Lewis was shot. D.I. 68 ("Jan. 5, 2016 Trial Tr.") at 48, 57. At trial, Shaw testified that she knew Defendant as one of Lewis' friends who had visited their house on prior occasions. *Id.* at 52–54.

[8] Lewis' neighbor, Nora Luevano, testified she observed a man and Lewis arguing and heard the words, "like, 'drugs,' and 'my own money,'" and saw a third man walk up and stand next to Defendant. Jan. 5, 2016 Trial Tr. at 94–96. Luevano's boyfriend, Jorge Lujan, also testified that he saw and heard the two men arguing and then heard gunshots. *Id.* at 127–28. Douglas Pressley, another neighbor, testified he "heard a few people down the street arguing" and then heard gun shots. *Id.* at 153

[9] Luevano testified she observed the man who was arguing with Lewis fire four shots at him and then another three as he ran away. Jan. 5, 2016 Trial Tr. at 98–99. Shaw identified the Defendant as the man arguing with Lewis prior to the shooting. *Id.* at 57.

[10] *See also supra* notes 6–8.

4

After the jury found him guilty, Defendant appealed his convictions, and on February 2, 2017, the Delaware Supreme Court issued an order affirming Defendant's convictions.[11]

## III. STANDARD OF REVIEW

Defendant's Motion was timely filed, is his first motion for postconviction relief, and raises claims of ineffective assistance of counsel.[12]

Ineffective assistance of counsel ("IAC") claims are governed by the two-prong test set forth by the United States Supreme Court in *Strickland v. Washington*.[13] To establish an IAC claim, a defendant must show: (1) counsel's representation fell below an objective standard of reasonableness; and (2) counsel's errors amounted to prejudice.[14] Both prongs of the *Strickland* test must be established in order for an IAC claim to prevail.[15]

Under *Strickland* and its progeny, "[j]udicial scrutiny of counsel's performance must be highly deferential"[16] and there is a strong presumption that

---

[11] *Cruz-Webster v. State*, 155 A.3d 833, 2017 WL 464536, at *4–5 (Del. Feb. 2, 2017) (TABLE). On appeal, the Delaware Supreme Court addressed three issues that Defendant now raises again in support of his ineffective assistance of counsel claims: (1) improper opinion testimony of a responding police officer; (2) improper vouching by the State for the credibility of a witness; and (3) improper admission of a witness's videotaped statement pursuant to 11 *Del. C.* § 3507. *See id.*
[12] *See* Super. Ct. Crim. R. 61(i)(1)–(4).
[13] *Strickland v. Washington*, 466 U.S. 668 (1984); *see Padilla v. Kentucky*, 559 U.S. 356, 371 (2010) ("Surmounting *Strickland*'s high bar is never an easy task.").
[14] *Strickland*, 466 U.S. at 688.
[15] *Id.* (The Court may consider either prong first).
[16] *Id.* at 689; *see also State v. Reyes*, 155 A.3d 331, 343 (Del. 2017).

"counsel's representation was within the 'wide range' of reasonable professional assistance."[17] In evaluating counsel's performance, the Court should "eliminate the distorting effects of hindsight," "reconstruct the circumstances of counsel's challenged conduct," and "evaluate the conduct from counsel's perspective at the time."[18] To overcome the strong presumption that counsel's representation was reasonable, the defendant must show that counsel's errors were so serious "that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."[19]

To show prejudice under *Strickland*, the defendant must establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[20] A reasonable probability is a "probability sufficient to undermine confidence in the outcome."[21] In assessing prejudice from counsel's errors, the Court in *Strickland* stated:

> When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.

---

[17] *Harrington v. Richter*, 562 U.S. 86, 104–05 (2011) ("The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom.") (citing *Strickland*, 466 U.S. at 690).

[18] *State v. Flowers*, 150 A.3d 276, 282 (Del. 2016) (quoting *Strickland*, 466 U.S. at 689)).

[19] *Harrington*, 562 U.S. at 104. The presumption requires overcoming the fact that counsel acted under a sound trial strategy.

[20] *Strickland*, 466 U.S. at 694; *see Hoskins v. State*, 102 A.3d 724, 730 (Del. 2014) ("Mere allegations of ineffectiveness will not suffice. A defendant must make specific allegations of actual prejudice and substantiate them.").

[21] *Id.*

. . . .

In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.[22]

Therefore, the Court must determine whether the defendant has demonstrated that, but for counsel's errors, the outcome would have been different.[23]

## IV. DISCUSSION

### A. IAC Claim One: Failure to Properly Object to the State Vouching for the Credibility of a Witness

Defendant argues Trial Counsel's performance fell below an objective standard of reasonableness because he did not object to Donald Cooper's testimony about his Witness Protection Agreement ("WPA") or the prosecutor's related comments during closing arguments.[24] According to Defendant, Cooper's testimony and the prosecutor's comments constituted the State vouching for Cooper's credibility.[25]

Cooper, Defendant's podmate, testified at trial that while awaiting trial, Defendant told him he shot Lewis with a 9-millimeter handgun because Lewis owed him money for marijuana and he was scared to fight Lewis.[26] Defendant told Cooper

---

[22] *Id.* at 695.

[23] *Id.* at 694.

[24] Motion at 15.

[25] *Id.* at 16. *See Rasin v. State*, 187 A.3d 1209, 2018 WL 2355941, at *2 (Del. 2018) (TABLE) (It is well-settled law that a prosecutor cannot vouch (positively or negatively) for the credibility of a witness).

[26] Jan. 6, 2016 Trial Tr. at 92. The details of Lewis' murder investigation were not public knowledge. Detective Garcia testified that in the January 10, 2015 arrest warrant, he did not

7

that the gun was "still out there" and that someone deleted the text messages from Lewis' phone before handing it over to the police so "it was like they were texting a ghost."[27] Cooper provided this information to Detective Ziemba with hope that it would help his own case.[28]

In response to Defendant's argument, Trial Counsel avers:

The jury's determination of Cooper's credibility was central to the outcome of the trial. Therefore, my objective was to impeach his credibility. **My strategy to impeach his credibility included an argument that he was motivated to please the State in order to obtain a benefit and therefore he was not a reliable witness. In order to accomplish that objective I was required to ask him about his [WPA] with the State.** I was in a Catch 22 situation. Any attempt to establish that Cooper's [WPA] included a benefit motivating his cooperation opened the door to other agreement details. Unfortunately, once I addressed the [WPA], the State was permitted to address other provisions of the agreement to rebut my argument. I did not feel that there was a basis to object to the State's rebuttal examination as I had opened the door to more detail about the agreement even though it could be interpreted as bolstering Cooper's credibility.

Eliciting testimony on redirect examination that a witness entered into an agreement that requires 'truthful testimony' has been interpreted to be permissible when the credibility of the witness has been attacked. **Regardless of the risk, I needed to question Cooper about the benefit he expected to receive in order to achieve my objective even**

---

include the type of gun used to kill Lewis or that the argument was over a debt. *Id.* at 130. Corporal Duffy testified that the Police Department's January 2015 press release did not include information about the type of firearm used or the argument because "it would hinder the investigation." *Id.* at 133–34 (press release submitted January 10, 2015). And, the police did, in fact, recover seven casings and three bullets fired from a 9-milimeter Luger. *Id.* at 146.

[27] *Id.* at 93.

[28] *Id.* at 94, 95. Det. Ziemba of New Castle County Police Department interviewed Cooper on February 3, 2015. Det. Ziemba testified that he and Cooper did not have a conversation about Cooper receiving a benefit in exchange for the information, and he was unaware of Cooper receiving anything in exchange for the information. *Id.* at 102–03.

**though that opened the door for the prosecutor to provide more details about the agreement. It was a calculated risk. If I did not pursue this strategy, I would not be able to pursue an argument that Cooper was not credible based upon the benefit he expected to receive. I deny that I was ineffective as claimed by Defendant.**[29]

Judicial scrutiny of Trial Counsel's strategies and decisions "must be highly deferential" as it is "all too easy for a court, examining [Trial Counsel's] defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."[30] Trial Counsel's decision not to object to the prosecutor's questioning on re-direct or comments during closing arguments was not objectively unreasonable. Trial Counsel knew it was critical to impeach Cooper's credibility, and to do so required questioning Cooper about the WPA. As Trial Counsel's Affidavits and the record make clear, Trial Counsel was well aware that by questioning Cooper on the WPA he would "open the door," thereby allowing the prosecutor to question Cooper on other provisions of the WPA, including Defendant's agreement to "testify truthfully."[31] Trial Counsel weighed the risks and benefits and made an informed decision to run the risk in order to impeach Cooper's credibility, and, as the Supreme Court noted on direct appeal, he obtained the benefit

---

[29] Suppl. Aff. 1–2 (emphasis added).
[30] *Strickland*, 466 U.S. at 689.
[31] *Id.* Before Cooper took the stand, the Court cautioned Trial Counsel that if he questioned Cooper regarding the WPA, he should be "very wary because if [he] open[s] the door there's no shutting it," and that the Court would "allow the State broad latitude on redirect if [he] go[es] down that road." Jan. 6, 2016 Trial Tr. at 61–65.

9

he sought: "[Trial Counsel] left the jury with the impression that Cooper's testimony was the result of benefits he was receiving from the State."[32]

Contrary to Defendant's argument, the prosecutor did not suggest or convey that he had any additional personal knowledge or belief that Cooper was telling the truth, and in his closing, he merely argued that the existence of the WPA was likely to incentivize Cooper not to lie. This was not inappropriate nor did it constitute vouching. Defendant fails to establish that Trial Counsel's performance fell below an objective standard of reasonableness and that he suffered prejudice as a result. Therefore, Defendant's first IAC claim fails.

### B. IAC Claim Two: Failure to Request a Mistrial for Improper Opinion Testimony

Defendant next argues that Trial Counsel's performance fell below an objective standard of reasonableness and he "suffered egregious prejudice" when Trial Counsel requested a curative instruction, rather than a mistrial, after Officer Barnes testified he did not believe Lewis when Lewis told him he did not know who shot him.[33]

---

[32] *Cruz-Webster*, 2017 WL 464536, at *4. *See Torres v. State*, 979 A.2d 1087, 1096 (Del. 2009) (holding it is not vouching for the prosecutor to: (1) question a witness on re-direct examination about a plea agreement, if the witness was questioned about the plea agreement on cross-examination or if the plea agreement is already admitted into evidence, or (2) remind the jury during closing arguments).

[33] Motion at 23, 26–27. Defendant also argues that Trial Counsel's failure to seek a mistrial prevented the proper preservation of the issue for direct appeal and prevented the Delaware Supreme Court from making a ruling on the matter. *Id.* at 30.

10

Officer Barnes testified at trial that he responded to the shooting and spoke with Lewis before he died. He asked Lewis several times what happened and who shot him.[34] According to Officer Barnes, Lewis said "he was standing on the front steps of his residence and two black males wearing all black shot him and ran towards Memorial Drive after they shot him."[35] The prosecutor asked Officer Barnes why he asked Lewis several times what happened, and Officer Barnes responded he did not believe Lewis did not know his shooter.[36] Trial Counsel objected immediately, moved to strike the testimony from the record and asked for a curative instruction.[37] The Court immediately struck the testimony and instructed the jury to "disregard the police officer's statement about his disbelief of what [Lewis] told him," explaining that "[w]hat the police officer thinks about the credibility of a witnesses [sic] is not relevant because you are the finders of fact in this case. You determine the credibility of the witnesses and evidence. That's *your* role."[38]

Trial Counsel, in hindsight, avers the "best practice would have been to move for a mistrial."[39] He acknowledges that although it was unlikely that trial court

---

[34] Jan. 6, 2016 Trial Tr. at 46.
[35] *Id.* at 47.
[36] *Id.* at 50.
[37] Jan. 6, 2016 Trial Tr. at 50–51. Trial Counsel asked the Court to instruct the jury to disregard Officer Barnes' answer.
[38] *Id.* at 52–54 (emphasis added).
[39] Suppl. Aff. at 3.

11

would grant it because there was no prosecutorial misconduct, it would have preserved the issue for appeal.[40] That said, Trial Counsel correctly notes:

> [E]ven if the issue was properly preserved, it still would have been reviewed under an abuse of discretion standard. That standard of review would have been formidable given the trial court's findings that no prosecutorial misconduct occurred.[41]

As the Delaware Supreme Court noted on Defendant's direct appeal, Trial Counsel "made a strategic decision to request a curative instruction and not a mistrial" in response to Officer Barnes' statement.[42] Defendant fails to overcome the strong presumption that Trial Counsel's decision was reasonable. In addition, Defendant fails to establish prejudice because the Court's immediate curative instruction cured any potential prejudice to Defendant.[43] Therefore, Defendant's second IAC claim fails.

### C. IAC Claim Three: Failure to Make a Proper Authentication Objection

Defendant argues that Trial Counsel's performance was ineffective because he did not raise a lack of authentication objection to the surveillance videos and receipts from Fawwaz Mohammed's store.[44] According to Defendant, if Trial Counsel had objected to the video surveillance and receipts by explicitly stating

---

[40] *Id.*

[41] *Id.*

[42] *Cruz-Webster*, 2017 WL 464536, at *4.

[43] *Id.* The Supreme Court expressly held, "[t]he trial judge did not abuse her discretion or commit plain error by not *sua sponte* ordering a mistrial."

[44] Motion at 36.

12

"D.R.E. 901 – lack of authentication," the Court would have excluded the evidence.[45]

Trial Counsel characterizes this claim as one of "form over substance."[46] The Court agrees. While Trial Counsel did not cite D.R.E. 901 or explicitly use the term "authentication," Trial Counsel raised an objection to the evidence at issue, articulated the basis for it, and the Court understood the objection.[47] The Court overruled Trial Counsel's objection, ruling that the date and time discrepancy went "to the weight not the admissibility."[48] Trial Counsel's objection was reasonable, the Court understood the bases for it when it overruled it, and had Trial Counsel added the word "authentication" or cited D.R.E. 901, the ruling would have been the same. Trial Counsel knew that.[49] Therefore, Defendant's third IAC claim fails.

---

[45] *Id.* at 38. D.R.E. 901(a) (In order to admit evidence, the proponent must first authenticate the item by providing evidence "sufficient to support a finding that the item is what the proponent claims it is.").

[46] Suppl. Aff. at 3.

[47] *See* Jan. 7, 2016 Trial Tr. at 97–98. After concluding *voir dire* of Mohammad, Trial Counsel objected, stating, "based upon -- for the purpose of what this is being presented. I think it's being presented to correspond to the transaction on the video, and the dates and times don't necessarily correspond." At the time, the Court assumed the grounds for objection to be D.R.E 402, 403, and 901.

[48] *Id.* Prior to the objection, the State had properly authenticated the surveillance videos and the receipts through Mohammad's testimony. At the time of his testimony, Mohammad had worked at the convenience store for ten years and was a clerk and manager. Mohammad testified that he was in the videos and all three videos were of the same event "just from different points of view." Mohammad also explained the process for generating receipts after a customer purchases cellular telephone minutes. Jan. 7, 2016 Trial Tr. at 82–104.

[49] *See* Suppl. Aff. at 3 ("Conversely, if I had specifically articulated that my objections was for lack of authentication, it is likely that the court would have made the same ruling.").

13

## D. IAC Claim Four: Failure to the Removal a Juror for Misconduct

Defendant argues that Trial Counsel's performance fell below an objective standard of reasonableness because he did not seek removal of Juror Number 7 on the basis of juror misconduct.[50] Defendant claims that Juror Number 7 displayed "consistent patterns of inattentiveness throughout the trial."[51] In support of this claim, Defendant cites to the first day of trial when the State advised the Court that Juror Number 7 "might be nodding off," and the last two days of trial when Juror Number 7 arrived late to the proceedings.[52]

Trial Counsel avers in his Supplemental Affidavit that he did not observe the juror fall asleep, however, he was "on notice" that the prosecutor thought the juror might be nodding off.[53] With regard to this claim of error, Trial Counsel avers:

---

[50] Motion at 40. Defendant argues that Juror Number 7's conduct is "akin" to the behavior of the juror in *Cooke v. State*, 97 A.3d 513 (Del. 2014). *Id.* at 47. As the trial judge (who recalls this trial), the Court finds Juror Number 7's conduct nowhere close to the misconduct of the *Cooke* juror. The juror in *Cooke* failed to follow the Court's instructions, attempted to ask the investigating officer a substantive question, yelled and cursed at the bailiff, was repeatedly late, and was unengaged throughout the trial. *See Cooke*, 97 A.3d at 550. When dismissing the *Cooke* juror, the trial judge stated,

> *[The juror] has been late, consistently late. And that in and of itself doesn't bother me.* But I just see a disruptive influence. And her behavior and conduct is such that I wouldn't take from an attorney and I wouldn't take it from a party and I'm not going to take it from her. I, therefore, reluctantly and over your objection and Mr. Cooke's objection . . . I'm going to excuse her.

*Id.* at n. 230 (emphasis added).

[51] Motion at 41.

[52] *Id.* at 42; *see* Jan. 5, 2016 Trial Tr. at 163; D.I. 60 ("Jan. 11, 2016 Trial Tr.") at 4–5; D.I. 61 ("Jan. 12, 2016 Trial Tr.") at 5.

[53] Suppl. Aff. at 4.

14

The better practice would have been for me to seek removal of [Juror Number 7] due to the juror's alleged misconduct if there was stronger evidence that she actually did nod off, and if there was evidence that it occurred during an essential portion of the trial. However, I do not believe that removal of [Juror Number 7] would have affected the outcome of the trial since, if she did nod off, it did not occur during an essential portion of the trial and did not cause prejudice to the Defendant.[54]

I did not have sufficient information to make the case for removing [Juror Number 7] when the comment was that she *might* be nodding off. I do not believe that I was negligent by failing to move to exclude [Juror Number 7] based upon an observation that she might be nodding off. It is conspicuous and telling that the prosecutor who observed the behavior did not feel compelled to move to exclude the juror.[55]

Trial Counsel's decision not to move for removal of Juror Number 7 was not unreasonable, nor did it result in prejudice to Defendant. Juror Number 7's possible "inattentiveness" during Pressley's testimony was brought to the Court's and Trial Counsel's attention on the first day of trial. The record indicates there was no issue with Juror Number 7 after this until the fifth day, when she arrived late to the proceeding. Aside from the State's comment that Juror Number 7 "*might* [have

---

[54] *Id.* According to Trial Counsel:

> The concern that Juror 7 might be nodding off occurred during the testimony of Douglas Pressley. Pressley was a minor, inconsequential witness since he did not observe the shooting and did not identify or implicate the Defendant in any way. . . . Pressley's testimony was not harmful to Defendant, nor was it exculpatory. Therefore, if Juror 7 nodded off during any portion of his testimony, Defendant did not suffer any meaningful prejudice which affected the outcome of the case.

*Id.* at 4–5.

[55] *Id.* at 4. The trial judge, whose long-standing practice is to keep a close eye on the jury throughout every trial, did not observe any juror sleeping at any point during Defendant's trial.

15

been] nodding off" during Pressley's testimony on day one, there is no evidence to support that she actually fell asleep or was otherwise inattentive, and there is no evidence to support prejudice to Defendant.[56]

With regard to Juror Number 7's tardiness on the last two days of trial, Trial Counsel avers:

> [Juror Number 7's] tardiness did not, in my mind, amount to misconduct supporting her removal as she explained that it was due to her involvement in work matters and that she expressed that she was 'ready' and 'fine' with being able to focus her attention on closing arguments.[57]

---

[56] *See Durham v. State*, 867 A.2d 176 (Del. 2005). In his post-trial briefing, Defendant asserts without record support that "*Juror Number 7 had completely fallen asleep on the first day of trial, as she was snoring, and the State had witnessed this behavior on more occasions . . . .*" Motion at 44 (emphasis added). The Court reviewed the entire trial transcript and was unable to find any support for these claims. Troubled by this, the Court ordered Defense Counsel to supplement Defendant's Motion with pinpoint cites supporting these claims. Defendant's supplement identified the very same portions of the record cited in his Motion and requested an evidentiary hearing. D.I. 118. As the State correctly notes, Defendant is unable to provide record support for these claims. See *id.*; D.I. 121.

[57] Suppl. Aff. at 5–6. *See* Jan. 12, 2016 Trial Tr. at 5–6. Before closings, the Court had the following exchange with Juror Number 7:

| THE COURT: | We have been waiting on you. I want to make sure everything is okay, and you are ready to listen to closing arguments and deliberate today. |
|---|---|
| JUROR 7: | I am ready. I am dealing with a case at work. An emergency came up. It started yesterday, where I had to launch my own investigation. I had a lot going on. I have been in work since about 5:00 a.m. in morning [sic]. I was outside. |
| THE COURT: | My empathy for that. Do you feel that's going to distract you? You can go attend to it. If you do, I can excuse you. I would rather have 100 percent of your attention than you be concerned about work. |
| JUROR 7: | I'm here. I'm fine. |

16

The Court defers to Trial Counsel's professional judgment that her tardiness "did not amount to misconduct supporting her removal."[58] Trial Counsel's judgment comports with the trial judge's decision (following her colloquy with the juror) to allow Juror Number 7 to continue serving on the jury.[59]

Defendant fails to establish that Trial Counsel's decision not to seek removal of Juror Number 7 fell below an objective standard of reasonableness and his decision caused prejudice to Defendant.[60] Therefore, Defendant's fourth IAC claim fails.

### E. IAC Claim Five: Failure to Object to Cooper's 11 *Del. C.* § 3507 Statement

Defendant argues that Trial Counsel's performance was ineffective because he failed to object to the admission of Cooper's videotaped 11 *Del. C.* § 3507 testimony ("3507 Statement").[61] According to Defendant, the 3507 Statement bolstered Cooper's testimony and vouched for his credibility.[62] Defendant maintains

---

[58] *See* Suppl. Aff. at 5.

[59] *See supra* note 57.

[60] *See United States v. Tierney*, 947 F.2d 854, 868–69 (8th Cir. 1991) (holding that a defendant's fundamental right to a fair trial was not infringed upon where a juror slept through the presentation of the defendant's evidence and the cross-examination of witnesses for the prosecution).

[61] Motion at 54.

[62] *Id.* at 51. *See Richardson v. State*, 43 A.3d 906, 909 (Del. 2012) ("[W]here a witness has full recall of the relevant events, and is not contradicting the out-of-court statement, the prior statement simply buttresses the in court testimony.").

that, at the very least, the 3507 Statement was cumulative and did not rebut an express or implied charge of recent fabrication or improper motive.[63]

Trial Counsel avers that "the best practice would have been . . . to object to the admission of the [3507 Statement]" and Cooper was prejudiced by his failure to do so.[64] Trial Counsel explains:

> There was a legal predicate to object to admission of Cooper's video statement. The legislative history of Section 3507 establishes that the statute was enacted to address the problem of a 'turncoat' witness. As articulated by the Court in *Richardson v. State*, 43 A.3d 906, 909 (Del. 2012), 'where a witness has a full recall of the relevant events, and is not contradicting the out-of-court statement, the prior statement simply buttresses the in court testimony. The statute was not intended to allow witnesses [sic] to double the impact of the witness's statement [sic].'
>
> Thus, there was a strong basis for objecting to the video under Section 3507, even though there may have been a basis for its admission under DRE 801(d)(1) on redirect.[65]

Failure to follow "best practice" does not equate to incompetence.[66] As seasoned Trial Counsel correctly notes, even if Trial Counsel had objected, the trial judge would have likely allowed the 3507 Statement be introduced (and admitted) on re-direct examination of Cooper to rebut Trial Counsel's charge of improper motive under D.R.E. 801(d)(1).[67] Trial Counsel knew this, as evidenced by his

---

[63] Motion at 52.
[64] Suppl. Aff. at 6 ("The prejudice of this error is that Cooper's testimony may have been improperly bolstered by the video statement.").
[65] *Id.*
[66] *See* source cited *supra* note 17.
[67] *See* D.R.E. 801(d)(1) (2014) (Pursuant to then-extant D.R.E. 801(d)(1), a witness' prior statement is not hearsay if the declarant testifies at "the trial or hearing and is subject to cross-

remarks during his opening statement and at a side bar before Cooper took the stand, when he preemptively implied that Cooper had an improper motive.[68]

But assuming, *arguendo*, Trial Counsel erred by not objecting to the 3507 Statement during Cooper's direct examination, Defendant's claim that Trial Counsel's error improperly bolstered Cooper's testimony and vouched for his credibility is not supportable given the record in this case. This is so because there was ample other evidence corroborating Cooper's testimony, including Shaw's testimony identifying Defendant as the man arguing with her nephew, Lewis, right before Lewis was shot, and Luevano's testimony that the man arguing with Lewis is the one who shot Lewis.[69]

Defendant fails to establish that but for Trial Counsel's alleged error, the jury would have had a reasonable doubt about Defendant's guilt. Admission of the 3507 Statement was not improper, and based on all the other evidence supporting

---

examination concerning the statement, and the statement is (A) inconsistent with his testimony, or (B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive, or (C) one of identification of a person."); *see also Stevenson v. State*, 149 A.3d 505 (Del. 2016) (holding that while the 11 *Del. C.* § 3507 statements were cumulative, they were admissible to rebut an express or implied charge of improper influence).

[68] *See* Jan. 5, 2016 Trial Tr. at 29–30, 61–62. Trial Counsel states that "even if an objection was overruled, the failure to object caused this issue to be addressed under the plain error standard of review instead of the more favorable abuse of discretion standard." Suppl. Aff. at 6–7. Again, looking at all the other evidence pointing to Defendant's guilt, the Court finds the jury would have found Defendant guilty without Cooper's 3507 Statement.

[69] *See* Jan. 5, 2016 Trial Tr. at 52–57, 98–99; *see also supra* notes 6–9, 26.

19

Defendant's guilt, there is no prejudice. Consequently, Defendant's fifth IAC claim fails.

### F. IAC Claim Six: Failure to Investigate a Potential Witness to Refute Cooper's Testimony

Last, Defendant argues that Trial Counsel's performance fell below an objective standard of reasonableness because he failed to investigate a potential witness — Gerald Atkins — who could refute Cooper's testimony.[70] Trial Counsel denies any claim of ineffectiveness on this issue.[71]

The chronology here is important. Defendant initially represented to the Court that he informed Trial Counsel before trial that: (1) Atkins witnessed Defendant's conversation with Cooper; (2) and Atkins could dispute Cooper's testimony.[72] Trial Counsel squarely refuted those representations in his First Affidavit:

> I do not recall that [Defendant], prior to trial, informed me of the existence of a witness to the conversation that occurred between him and Donald Cooper and who could dispute Cooper's account of events. Defendant could not have made that request prior to trial because the Court did not unseal that information until after trial began. If the alleged presence of Atkins was contained in the information provided by the State, it would not have been disclosed to Defendant until January 6, two days after the trial began. If it was first disclosed during

---

[70] Motion at 59–61. Throughout the record, Atkins is also referred to as "Geez," "G," and "Gerald Daykins."

[71] *See* First Aff. at 7; Suppl. Aff. at 7–8.

[72] Motion at 58.

Cooper's trial testimony, then Defendant and I would have learned about it at that time.[73]

After receiving Trial Counsel's First Affidavit, Defendant admitted:

Trial Counsel is correct; [Defendant] concedes that he was initially mistaken as to when he asked [Trial Counsel] to interview Gerald Atkins.[74]

I, Maurice Cruz-Webster, attest that during trial on January 6, 2016, I learned for the first time that the State's witness, Mr. Donald Cooper, alleged I had a jailhouse conversation with him in which I purportedly admitted to shooting and killing Mr. Lewis. It was during Mr. Cooper's testimony on direct examination that I also first learned of [Atkins'] involvement in my case.[75]

Now, Defendant argues that Trial Counsel should have known that Atkins could have potentially refuted Cooper's testimony because: (1) the State provided Trial Counsel with a copy of Cooper's February 3, 2015 statement which included references to Atkins' nicknames;[76] and (2) after hearing Cooper refer to "Geez" at trial, Defendant immediately gave Trial Counsel Atkins' real name and told him to call Atkins to impeach Cooper.[77] Defendant further argues that Trial Counsel was ineffective for not investigating Defendant's assertion about Atkins after the trial because he could have filed a motion for a new trial.[78]

---

[73] First Aff. at 7 (filed Jan. 30, 2019); *see* Suppl. Aff. at 7–8.
[74] D.I. 112 (Reply to State's Response) at 19 (citing Ex. E – Affidavit of Maurice Cruz-Webster dated Sept. 26, 2019).
[75] *Id.*, Ex. E.
[76] *Id.* at 17–19.
[77] *Id.* (citing Ex. E).
[78] *Id.*

Trial Counsel acknowledges that the State disclosed the identity of Cooper at the time of jury selection on January 4, 2016.[79] On January 6, 2016, in response to Trial Counsel's request, the Court lifted the Protective Order Excluding Witness Information so that Trial Counsel could share the information regarding Cooper's statement with Defendant.[80] Trial Counsel avers he cannot recall whether the information provided included information that Atkins was present at the time Defendant allegedly made admissions to Cooper.[81] Trial Counsel further avers that it was not until after sentencing that Defendant asked Trial Counsel to interview Atkins and determine whether Cooper's testimony contradicted Atkins' account of the events.[82] At that point, Trial Counsel declined to interview Atkins or anyone else from Defendant's pod, explaining that "[a]ny helpful information from any post trial interview is not admissible on direct appeal, although it may support a claim made on a Rule 61 Motion for Post Conviction Relief."[83]

---

[79] Suppl. Aff. at 7.

[80] *Id.*

[81] *Id.*

[82] Suppl. Aff. at 8. After his sentencing but before he filed this Motion, Defendant wrote to Trial Counsel asking him to interview Atkins. Defendant's letter reads, in pertinent part, as follows:

> Can you go see Gerold [sic] Atkins to see if the story Donold [sic] Cooper told about us having a conversation about what happen [sic], or if his story is conflicting or a contradiction, get him to sign an affidavit with his statement please.

*Id.* (Attached letter from Defendant to Trial Counsel).

[83] *Id.* (Attached June 29, 2016 letter to Defendant).

When the Court reviews an ineffective assistance of counsel claim for failure to investigate, trial counsel's decision to investigate "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."[84] Whether the trial counsel's strategic investigative decision is reasonable may be "determined or substantially influenced by the defendant's own statements or actions."[85] Here, the Court defers to Trial Counsel's decision not to interview Atkins after trial because he was keenly aware of the plethora of evidence establishing Defendant's guilt,[86] and it was unclear whether Atkins could even refute Cooper's testimony.[87] Based on the record, Counsel's decision was not objectively unreasonable.

---

[84] *Strickland*, 466 U.S. at 690–91.

[85] *Id.* at 691 ("Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.").

[86] As the State correctly notes, there was ample evidence establishing Defendant's guilt, such as the series of text messages between Defendant and Lewis, Defendant's presence at Lewis' home through Shaw's testimony and cellular phone positioning, and Luevano's observation of the shooting. *See* D.I. 107 at 34–37.

[87] *See supra* note 78. In the Motion, Rule 61 Counsel states he hired an investigator to interview Atkins; and now, two years after trial, Atkins claims that Cooper lied and Defendant never admitted to shooting Lewis. Motion at 58–59. Yet Rule 61 Counsel does not provide an affidavit supporting this proffer nor is there any indication that Atkins' statements to the investigator were made under oath. *See id.* at 59, A381–98. Instead, Rule 61 Counsel requests an evidentiary hearing to compel Atkins' testimony. *Id.* at 61–62. This does not change the Court's analysis because *at the time* Defendant requested Trial Counsel to interview Atkins, it was unclear whether Atkins could even refute Cooper's testimony. *See also Strickland*, 466 U.S. at 691 (noting that the Court must apply a "heavy measure of deference to counsel's judgments" when assessing reasonableness of a counsel's particular decision not to investigate).

23

Even assuming, *arguendo*, Trial Counsel's performance fell below an objective standard of reasonableness, Defendant is unable to establish prejudice because he fails to overcome all the other evidence corroborating Cooper's testimony.[88] For these reasons, Defendant's sixth IAC claim fails.

### G. Claim of Cumulative Error

Defendant's final claim is that all of Trial Counsel's alleged errors cumulatively resulted in an unfair trial.[89] To sustain a constitutional claim of cumulative error, the defendant must show "actual prejudice" which was the result of multiple errors.[90] Where there are multiple errors in a trial, the Court weighs their cumulative impact to determine if, combined, they are "so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process."[91] Defendant has failed to meet his burden. The trial judge recalls this trial. Trial Counsel afforded Defendant zealous representation and, as discussed above, the Court does not find Trial Counsel committed multiple errors. But assuming, *arguendo*, he did, they were not so clearly prejudicial as to jeopardize the fairness and integrity of the trial process.

---

[88] *See supra* p. 19.
[89] Motion at 65.
[90] *Michaels v. State*, 970 A.2d 223, 231–32 (Del. 2009) (citing *Fahy v. Horn*, 516 F.3d 169, 205 (3d Cir. 2008)).
[91] *Hoskins*, 102 A.3d at 735.

## V. CONCLUSION

**NOW THEREFORE**, for the foregoing reasons, Defendant's Amended

Motion for Postconviction Relief is **DENIED**.

**IT IS SO ORDERED.**

Jan R. Jurden, President Judge

Original to Prothonotary

cc:    Sean P. Lugg, Esq., DAG
       Christopher Koyste, Esq.
       Michael W. Modica, Esq.