Justin P. **ERSKINE**, Defendant Below, Appellant,

v.

**STATE of Delaware**, Plaintiff Below, Appellee.

No. 416, 2009.

Supreme Court of Delaware.

Submitted: June 23, 2010.

Decided: June 24, 2010.

Nicole M. Walker, Esquire, Office of the Public Defender, Wilmington, Delaware, for Appellant.

Paul R. Wallace, Esquire, Department of Justice, Wilmington, Delaware, for Appellee.

Before STEELE, Chief Justice, HOLLAND and BERGER, Justices.

BERGER, Justice:

■ In this criminal appeal we address the need for a jury instruction on an accomplice's mental state and culpability for an aggravating factor. It is settled law that a court must give instructions on lesser included offenses only if requested to do so by either party, and only if there is a rational basis in the evidence to acquit the defendant of the charged offense and find the defendant guilty of the lesser one. By statute, an accomplice is criminally liable for an offense only on the basis of the accomplice's own mental state and accountability for an aggravating factor. The question is whether the court must instruct on an accomplice's lesser levels of liability if there is no request for that instruction, or if there is no rational basis in the evidence to support a lesser level of liability. We hold that the accomplice "level of liability" instruction, like the lesser included offense instruction, should be given only if there is a rational basis in the record to support it. We do not reach the question of whether the instruction must be given even if not requested by one of the parties. The Superior Court correctly refrained from giving the instruction. Accordingly, we affirm.

### Factual and Procedural Background

On June 5, 2006, it rained. The bad weather gave Justin Erskine and his co-worker, David Hamilton, a day off from their landscaping jobs. They started drinking, and were planning on driving to Baltimore, but first they stopped at Matt Minker's house. Minker was Hamilton's friend, and Minker wanted Hamilton to get him some percocet pills. Hamilton had a few connections, but he did not find anyone who had the pills. Nonetheless, Mink-

er gave Hamilton $300 and asked him to get percocet if he could.

As Erskine and Hamilton drove out of Minker's neighborhood, Hamilton saw two drug dealers—Trevor Moncrief and Raymond Ward. They told Hamilton that they could get the percocet, but that they would have to drive to the source. Hamilton, who was driving, told the two men to get in the back seat. The four men drove around for several hours without finding any drugs. Hamilton eventually dropped the dealers off at their house and returned to Minker's house. At Minker's house, Hamilton and Erskine continued to drink for several hours. At some point, Hamilton went out to his truck to get something, and he saw Moncrief and Ward standing there. They told Hamilton that they had another connection who could get the percocet.

After Hamilton confirmed that Minker still wanted the drugs, he and Erskine again started driving around with Moncrief and Ward. At their first stop, Moncrief and Ward spoke to some people and came back with a price that Hamilton found unsatisfactory. While Hamilton was discussing the price, approximately 12 people surrounded the truck, and Hamilton heard someone suggest that they would rob him. Hamilton decided to leave, and Moncrief and Ward returned to the back seat of the truck. They drove to another location, where Hamilton was able to buy 3 percocet pills from one of Ward's relatives.

The four men were still driving around when Hamilton's friend, Jesus Aviles, called to say that he was bored. Hamilton told Aviles what had happened at their first stop, and Aviles insisted that Hamilton pick him up. Aviles got in the passenger side of the front seat, next to Erskine. Aviles noticed Minker's shotgun, which was next to Hamilton, and asked to see it. While the five men were driving on a back road, they started to argue about whether Moncrief and Ward had set up Hamilton and Erskine. Aviles suddenly turned and shot Ward in the face. Then he shot Moncrief in the side of his head.

After the shooting, Aviles "freaked out" and demanded that Hamilton take him home. He told Hamilton to "take care of the evidence" and warned both men that he knew where they and their families lived. Hamilton and Erskine drove to Hamilton's sister's house to consult with her boyfriend, Raymond Gleaser. Hamilton explained that Moncrief and Ward tried to rob him, and that he shot them in self defense. He also commented, in a threatening manner, that there were more shells in the shotgun.

Hamilton and Gleaser decided to bury the bodies in the woods behind Gleaser's mother's house in Maryland. While Hamilton, Gleaser and Erskine were standing by the truck, getting ready to leave, Hamilton heard a noise and discovered that Moncrief was still breathing. Erskine handed Hamilton his butterfly knife and told Hamilton to finish killing Moncrief. Hamilton cut Moncrief's throat, but Moncrief did not die. Justin then told Hamilton to stab Moncrief in the lung. Hamilton did so, and Moncrief died shortly thereafter. The three men then drove to Maryland, dug graves and buried the bodies.

Gleaser returned to his house, and Hamilton and Erskine returned to Minker's house. Hamilton gave Minker back his shotgun and told him to clean it. Erskine got fresh clothes at Minker's house, while Hamilton drove off in the bloody truck. The police took Hamilton into custody later that day, and Hamilton continued to tell the self defense story. Erskine's first statement to the police, likewise, made no mention of Aviles. Seven months later, after Erskine knew that Hamilton had told

his attorneys about Aviles, Erskine went to the police and identified Aviles as the shooter. Erskine and Aviles were arrested shortly thereafter.

Erskine was charged with first degree murder, possession of a deadly weapon during the commission of a felony, tampering with physical evidence, and two counts of conspiracy. He refused several plea offers and relied on the defense of duress. Dr. Stephen Mechanick opined that Erskine was traumatized by the shootings and that he was afraid for his own life. In his report, Mechanick reviewed all of the witness's statements, including Erskine's. Mechanick explained that Erskine did not want Moncrief to be killed, he "just wanted to be out of [the] nightmare."[1] Mechanick's report concluded that Erskine's conduct was "substantially influenced by the explicit threats and duress that he experienced from Mr. Hamilton, and ... by his fear of being harmed or killed by Mr. Aviles and Mr. Hamilton."[2] Notwithstanding Mechanick's opinion, the jury found Erskine guilty as charged. This appeal followed.

### Discussion

Erskine raises two issues on appeal. First, he argues that the trial court erred in failing to give complete jury instructions on accomplice liability. Because Erskine failed to request those instructions, we review for plain error. "Under the plain error standard of review, the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process."[3]

■ A person may be convicted of an offense as a principal, based on his own conduct, or as an accomplice to another person.[4] Erskine was charged as a principal, but the State proceeded on the basis that Erskine was either an accomplice or a principal. An accomplice "is guilty of an offense committed by another person when ... intending to promote or facilitate the commission of the offense the [accomplice] ... aids ... or attempts to aid the other person in ... committing it...."[5] The trial judge gave a correct jury instruction on the issue of whether Erskine was an accomplice to Moncrief's murder.

In some cases, however, it is not enough for the jury to decide that a defendant is an accomplice. Under 11 *Del. C.* § 274, if two or more people are liable for "an offense which is divided into degrees, each person is guilty of an offense of such degree as is compatible with that person's own culpable mental state and with that person's own accountability for an aggravating fact or circumstance."[6] Erskine was charged with first degree murder, which is an offense divided into degrees.[7] But he did not ask for a so-called "§ 274 instruction," and the trial court did not give the instruction *sua sponte*. Erskine argues that, because the trial court was required to give the § 274 instruction, whether requested or not, the failure to do so was plain error.

■ In pressing this argument, Erskine overlooks a fundamental underpinning to all jury instructions—there must be a factual basis in the record to support

1. Appellant's Appendix, A–163.

2. Appellant's Appendix, A–33.

3. *Wainwright v. State,* 504 A.2d 1096, 1100 (Del.1986).

4. 11 *Del. C.* § 275.

5. 11 *Del. C.* § 271(2) b.

6. 11 *Del. C.* § 274; *Allen v. State,* 970 A.2d 203 (Del.2009).

7. *See:* 11 *Del. C.* §§ 636, 635, 632, 631.

the instruction. In *Ayers v. State*[8], for example, the defendant was either the shooter or an accomplice in the shooting of Arthur Wells. The trial court gave instructions on accomplice liability as well as the lesser degrees of homicide, as required by § 274. But the trial court denied Ayers' request for a jury instruction on the lesser-included offense of assault. This Court affirmed, and explained:

> As part of its instructions on accomplice liability, the Superior Court properly followed this Court's holdings in *Chance* [*v. State*, 685 A.2d 351 (Del. 2000)] and *Demby v. State* [744 A.2d 976 (Del.2000)], by instructing the jury on the lesser-included degrees of homicide. In the event the jury found that Ayers was [an] accomplice rather than an innocent bystander, that instruction permitted the jury to find Ayers guilty of a homicide offense in such degree as was compatible with his own mental state as the non-shooter. The record reflects no rational basis in the evidence, however, for instructing the jury on assault. Unlike *Chance*, where the various participants in the assault beat and kicked the victim to death, this case involved a lone gunman who walked up to Wells and shot him in the back and abdomen.[9]

The record here establishes that Erskine handed his own knife to Hamilton, and told Hamilton to finish killing Moncrief. When Hamilton's first effort—cutting Moncrief's throat—did not work, Erskine told Hamilton to stab Moncrief in the lung. There is no evidence of anything but intentional conduct. Thus, there is no basis on which to instruct the jury that Erskine's individual mental state could have been reckless (whether or not the circumstances manifested a cruel and depraved indifference to human life), or criminally negligent.[10] Accordingly, we find no error in the trial court's failure to give a § 274 instruction.[11]

Erskine's second argument relates to his duress defense. He contends that he was seriously prejudiced by improper comments made by the State during its rebuttal argument. Mechanick provided the expert opinion that Erskine had been traumatized and was under duress when he gave Hamilton his knife and told Hamilton to finish killing Moncrief. On cross-examination, the State asked numerous questions about how much Mechanick was being paid to provide that opinion. In rebuttal argument, the State again stressed Mechanick's fee arrangement, suggesting several times that he was influenced by the money he was getting for his services. At one point, the State said, Dr. Mechanick's opinion was "bought and paid for"

**8.** 844 A.2d 304 (Del.2004).

**9.** *Id.* at 309–310 (Citation omitted.). *See, also: Fuller v. State*, 860 A.2d 324, 331 (Del. 2004) (Sufficient evidence for judge to instruct on joint possession of drugs.); *Gutierrez v. State*, 842 A.2d 650, 652 (Del.2004) (Court must instruct on self-defense if any credible evidence to support it.); *Burrell v. State*, 766 A.2d 19, 26 (Del.2000) (Trial court properly refused to give "mistake of fact" instruction where no rational basis in the evidence to support it.).

**10.** If the jury had accepted Erskine's duress defense, he would not be liable for his conduct because the jury would have found that he was coerced by Hamilton's or Aviles' threat of force against him and his family. 11 *Del. C.* § 431(a). Erskine's actions, however, would still be intentional.

**11.** There remains a related question as to whether a party must request a § 274 instruction under the "party autonomy" rule. *See: Ramsey v. State*, 996 A.2d 782 (Del.2010); *State v. Cox*, 851 A.2d 1269, 1273 (Del.2003). Erskine made no such request, but we need not reach this issue in light of the absence of evidentiary support for the instruction.

and that he "made $5,000 so he could sit up and tell you how the defendant was so scared he couldn't do anything ...."[12]

Erskine did not object, but the trial court discussed the "bought and paid for" comment with counsel the following morning. The State tried to support its choice of language. The trial court saw things differently:

> In all the cases I've presided over, both on the civil and criminal side, I've never heard even the most radical attorney from the plaintiff's tort bar, from the insurance bar, or on the criminal side, refer to the other side's expert as having been "bought and paid for."

> \*     \*     \*

> I think it's sort of a loaded phrase. I think it's tantamount to an expression of personal opinion that the witness should not be believed.[13]

The trial court then instructed the jury to disregard the comment. On appeal, Erskine contends that the curative instruction was inadequate because it was given the day after closing arguments and because it did not refer to other improper comments along the same lines as the "bought and paid for" comment.

■ The process by which we review claims of prosecutorial misconduct is set forth in *Hunter v. State*.[14] First, the Court must decide whether there was any misconduct. We agree with the trial court, that the State's use of the phrase "bought and paid for" was improper. It was pejorative and clearly intended to convey the prosecutor's belief that Mechanick was not giving a professionally supportable opinion. Next, the Court must consider "the closeness of the case, the centrality of the issue affected by the (alleged) error, and the steps taken to mitigate the effects of the error."[15]

■ This was not a close case. Both Erskine and his expert essentially admitted that he participated in Moncrief's murder. The other witnesses confirmed most, if not all, of the critical facts. But Mechanick's credibility was important to Erskine's defense. As to the third factor, a curative instruction was given, and such an instruction generally is sufficient to redress any prejudice to the defendant.[16] Considering the three *Hughes* factors, we are satisfied that the prosecutorial misconduct did not deprive Erskine of a fair trial. The last step of the analysis requires the Court to determine whether this comment was part of a persistent pattern of misconduct. We find that it was not. Accordingly, although the phrase "bought and paid for" goes beyond the range of acceptable argument, it was harmless error beyond a reasonable doubt.

### Conclusion

Based on the foregoing, the judgments of the Superior Court are affirmed.

---

**12.** Appellant's Appendix, A–236.

**13.** Appellant's Appendix, A–254.

**14.** 815 A.2d 730 (Del.2002).

**15.** *Hughes v. State*, 437 A.2d 559, 571 (Del. 1981) (quoting *Dyson v. United States*, 418 A.2d 127, 132 (D.C.1980)).

**16.** *Pennell v. State*, 602 A.2d 48, 52 (Del. 1991).