Earnest A. RICHARDSON, Defendant Below, Appellant,

v.

STATE of Delaware, Plaintiff Below, Appellee.

Nos. 761, 2010, 774, 2010.

Supreme Court of Delaware.

Submitted: Feb. 22, 2012.
Decided: May 10, 2012.
Revised: May 14, 2012.

Nicole M. Walker, Esquire, (argued), Office of the Public Defender, Wilmington, Delaware, for Appellant.

Paul R. Wallace, Esquire, (argued), Timothy J. Donovan, Jr., Esquire and Elizabeth A. Powers, Esquire, Department of Justice, Wilmington, Delaware, for Appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices.

BERGER, Justice:

In this appeal we again consider the use of out-of-court statements in criminal prosecutions. By statute, such statements may be used as affirmative evidence if a proper foundation is laid, and the witness is subject to cross-examination at the trial. But only the witness's statement is admissible—not the interviewer's explanations or opinions. In a trilogy of opinions issued in 2010, this Court addressed "recurring problems" with the admission of out-of-court statements. The Court noted more than a decade of decisions uniformly requiring that they be redacted to eliminate the third party's inadmissible comments. In this case, the inadmissible comments were made in court, when the interviewer explained the protocol used for interviewing children about sex abuse. The interviewer offered her opinion that the protocol makes it "very obvious when [the children] are being truthful." That was impermissible vouching and requires reversal.

**Factual and Procedural Background**

Between 2001 and 2005, Earnest Richardson lived with his aunt, Lucille Kinard, in Wilmington, Delaware. Lucille also provided a temporary home for other family members, including Brenda and Linda[1], her two granddaughters. Brenda testified that in 2001 or 2002, when she was about 6 years old and Richardson was 16, Richardson sexually assaulted her. The two were sitting on the bed in Kinard's bedroom when Richardson unzipped his pants, pulled out his penis, and told her to "start sucking." Brenda testified that Richardson pulled her head back and forth with

---

1. Pseudonyms have previously been assigned to the two complainants.

his penis in her mouth. Afterward, Richardson told Brenda not to tell anyone. Brenda testified that another incident took place a few months later. The two again were in Kinard's bedroom. Richardson unbuckled her pants and placed his finger in her vagina. He also sucked Brenda's nipples. Richardson stopped when he heard someone coming up the stairs.

Linda testified about three incidents that took place in the summer of 2005, when she was 10 years old, and Richardson was 20. She said that she was in Kinard's bedroom with a girlfriend and Brenda. When the other two girls went downstairs for something to drink, Richardson walked past the room and saw that Linda was alone. He went in and closed the bedroom door. Linda was sitting on the bed and Richardson was standing over her. He pulled down her shorts and put his finger in her vagina. Richardson stopped when he heard the two girls coming up the stairs. A few weeks later, Richardson attacked Linda while she was alone in Kinard's bedroom. He put his fingers in her vagina and also tried to force her to perform fellatio. About a month after that, Richardson and Linda again were alone in a second floor bedroom, with the door shut. Richardson forced Linda to engage in sexual intercourse.

Neither of the girls told anyone what Richardson did to them for some time. In 2005 or 2006, the two girls confided in each other, but they agreed not to tell anyone else. Linda told her mother in May 2009, during the course of an argument. She testified that she was angry and blamed her mother for leaving her to be raped at Kinard's house. Linda's mother immediately called the police. After interviewing Linda, the officer referred Linda to the Child Advocacy Center of Delaware (CAC). Susan Polly, a forensic interviewer at CAC, conducted a videotaped interview of both girls.

At trial, Brenda and Linda testified in detail about Richardson's assaults. Nonetheless, the State introduced the recorded CAC interviews, and it appears that Richardson never objected. Before playing the first video, the State called Polly to provide a foundation. Polly testified that she had been a Newark Police officer for 26 years before becoming a CAC interviewer. She then explained how she was specially trained to interview children using a protocol called "RATAC." The acronym stands for Rapport, Anatomy, Touch, Abuse, and Closure. After the video was played, the State asked Polly whether the child always discloses what happened. Polly said that victims do not always tell the whole story consistently because disclosure is a process. Polly concluded that it is very apparent when a child is telling the truth.

Richardson took the stand and denied everything. The jury found him guilty on four of the six charges, and he was sentenced to serve 50 years in prison. This appeal followed.

## Discussion

Richardson raises two issues on appeal. First, he contends that the trial court abused its discretion when it permitted the CAC interviewer to testify about the RATAC interview techniques and the interviewer's opinion that the children's statements were truthful. Second, he argues that the trial court should have given a limiting instruction, as requested, after the State asked Brenda how she felt about testifying in front of her family, and she said she was nervous and embarrassed. Both claims have some merit, and the first requires reversal.

Title 11, Section 3507 of the Delaware Code provides, in part:

(a) In a criminal prosecution, the voluntary out-of-court prior statement of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent testimonial value.

(b) The rule in subsection (a) of this section shall apply regardless of whether the witness' in-court testimony is consistent with the prior statement or not. The rule shall likewise apply with or without a showing of surprise by the introducing party....

In three recent cases, this Court addressed several recurring problems concerning the admissibility of out-of-court statements.[2] It should be apparent, from those and many earlier precedents, that the use of § 3507 statements must be carefully circumscribed to protect defendants' constitutional rights to confront and cross-examine witnesses.[3] Yet it seems that, whenever a § 3507 is offered into evidence, the only consideration is whether a proper foundation has been established. Where, as here, the witnesses testified in detail about the same incidents reported to the CAC interviewer, the CAC tapes would appear to be cumulative and subject to being excluded on that ground. We recognize that Richardson did not raise this point, and we are not basing our decision on a rationale not presented to the this Court or the trial court. We think it is important, however, to make note of the fact that § 3507 does not trump all other rules of admissibility.[4] The statute was enacted to address the problem of a "turncoat" witness.[5] Where a witness has full recall of the relevant events, and is not contradicting the out-of-court statement, the prior statement simply buttresses the in-court testimony. The statute was not intended to allow parties to double the impact of the witness's evidence.

■■■ Whether the § 3507 statements were cumulative or not, we must reverse because the CAC interviewer's testimony was inadmissible and unfairly prejudicial. To provide a proper foundation for the introduction of a § 3507 statement, the offering party must establish that the out-of-court statement was voluntary; the witness must testify about the content of the prior statement and whether or not it is true; and the witness must be available for cross-examination.[6] If the voluntariness of the statement is not in issue, the interviewer's testimony should be limited to authentication.

In this case, by contrast, the CAC interviewer testified about her background, training, and interview techniques. Polly told the jury that she is a retired Newark Police Officer with 26 years on the force. When she began work as a forensic interviewer at CAC, Polly had two weeks of training to learn how to interview children who have been sexually assaulted. Polly explained that the RATAC protocol is a method of interviewing children. The "R" stands for rapport, which involves making the child comfortable by drawing pictures or talking about the child's family. The "A" stands for anatomy, and is the part of the interview where the child identifies and names parts of the body. The "T"

**2.** *See: Woodlin v. State,* 3 A.3d 1084 (Del. 2010); *Blake v. State,* 3 A.3d 1077 (Del.2010); *Stevens v. State,* 3 A.3d 1070 (Del.2010).

**3.** *Hassan–El v. State,* 911 A.2d 385, 396 (Del. 2006).

**4.** *See: Keys v. State,* 337 A.2d 18, 22 (Del. 1975) ("Even if the Statute is viewed in a limited sense as remedial, it becomes only one segment of the complex that is the law of evidence and it should be interpreted in light of the preexisting law....").

**5.** *Blake v. State,* 3 A.3d at 1082.

**6.** *Woodlin v. State,* 3 A.3d at 1088.

stands for touch, which is a discussion of "what places are okay and what places are not okay to touch."[7] The second "A" stands for abuse, "[a]nd that's where we get into what definitely has happened and we let the child tell their version of what happened."[8] The "C" stands for closure, and is the time when the interviewer reinforces the fact that the children did not do anything wrong, and that they should find an adult they can trust to talk to about these matters.

After the videotape of Brenda's interview had been played, the State asked Polly to explain the phrase "disclosure is a process":

Q. Can you explain to the jury what that means?

A. Yeah. Something that I was taught over and over again in my training that when victims disclose, it's not an event, it's not a one-time thing where they are going to sit down and tell everything that happened. It really is a process of uncovering what happened and talking about it.

So, sometimes I would get children that . . . might not tell me anything, but they told somebody else something. So, it just goes to show that they are not always going to respond to somebody's questions with truthful responses like that, because it is a process for them. . . .

Q. You just said something a little confusing. You said you're not going to

always get truthful answers from them. Do you mean—

A. That probably wasn't a very good choice of words there.

I think what I meant to say is that . . . if you ask a child a question one day, the answer the next day may be a little bit different. . . .

\*   \*   \*

I think as far as truthfulness, I think it's very apparent when you talk with a child and go through that whether—I think it's very obvious when they are being truthful.[9]

▮ Richardson did not object to this colloquy, although he had objected to the introduction of Polly's resume.[10] Whether the admission of Polly's testimony is reviewed under the abuse of discretion or plain error standard, however, the result is the same. Polly's sole role was to authenticate the videotape.[11] It is settled law that "a witness may not bolster or vouch for the credibility of another witness by testifying that the other witness is telling the truth."[12] "[I]mproper vouching includes testimony that *directly or indirectly* provides an . opinion on the veracity of a particular witness."[13] The admission of such testimony constitutes plain and reversible error.[14]

▮ This case turned entirely on credibility. There was no evidence to support the girls' statements, and the conduct in question allegedly occurred many years

---

7. Appellant's Appendix, A–35.

8. *Ibid.*

9. Appellant's Appendix, A–36.

10. The trial court ruled that the resume was inadmissible, but that the State could ask Polly about her background and credentials.

11. Here, there was no issue as to whether the interview process was infirm for some reason.

Likewise, there was no issue as to voluntariness.

12. *Capano v. State*, 781 A.2d 556, 595 (Del. 2001).

13. *Ibid.* (Emphasis in original.).

14. *Wheat v. State*, 527 A.2d 269, 275 (Del. 1987); *Powell v. State*, 527 A.2d 276, 279 (Del.1987).

before it was reported to the police. Polly's testimony about her background, training, and the RATAC protocol served no purpose other than to validate the interview process, and its ability to draw out the truth from child victims. Polly was not an expert witness and it is doubtful that the jury required an expert to explain the way children are interviewed. Even if she had been admitted as an expert, Polly should not have been allowed to offer an opinion as to the truthfulness of the children's statements. In sum, Polly's testimony constituted plain and reversible error.

 Richardson also complains that the trial court should have given a limiting instruction after the State elicited the following testimony from Brenda:

Q. And by the way, is your Mom in the courtroom?

A. Yes.

Q. Do you have other family members in the courtroom?

A. Yes.

Q. How does it make you feel to be saying this in front of them?

A. Embarrassed.[15]

Richardson objected, and moved for a mistrial. The court denied the motion, but recognized that the testimony was inappropriate because it would appeal to the jury's emotions. Richardson asked the trial court to give a curative instruction, but the court declined, noting that it would give the standard "sympathy" instruction at the end of the trial.

■ We review evidentiary rulings for abuse of discretion.[16] The State wanted the jury to understand that Brenda was embarrassed, because it wanted to explain why her demeanor was flat. But having a young woman testify that she is embarrassed naturally engenders sympathy,

even if that is not the purpose of the questioning. Since the questioning already had been interrupted by Richardson's objection, we find it difficult to understand why the trial court would refuse to give a simple curative instruction before the State continued its examination of Brenda. In light of the deferential standard of review, however, we find no abuse of discretion.

### Conclusion

Based on the foregoing, the judgments of the Superior Court are reversed, and this matter is remanded for a new trial. Jurisdiction is not retained.

---

15. Appellant's Appendix, A–30.

16. *Harris v. State,* 991 A.2d 1135 (Del.2010).