IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| AJ MCMULLEN, | § | |
| | § | |
| | § | |
| Defendant Below, | § | No. 75, 2020 |
| Appellant, | § | |
| | § | |
| | § | |
| v. | § | Court Below:  Superior Court |
| | § | of the State of Delaware |
| | § | |
| STATE OF DELAWARE, | § | |
| | § | I.D. No. 1810004048A (S) |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted:  March 24, 2021
Decided:     May 24, 2021

Before **VALIHURA**, **VAUGHN**, and **MONTGOMERY-REEVES**, Justices.

Upon appeal from the Superior Court.  **AFFIRMED**.

Santino Ceccotti, Esquire, Office of the Public Defender, Wilmington, Delaware for Appellant.

Matthew C. Bloom, Esquire, Department of Justice, Wilmington, Delaware for Appellee.

**VALIHURA**, Justice:

Following a bench trial, the Superior Court convicted A.J. McMullen ("McMullen") of Murder in the First Degree and Possession of a Firearm During the Commission of a Felony ("PFDCF"). McMullen appeals his convictions, asserting that the Superior Court improperly admitted cumulative statements from witnesses pursuant to 11 *Del. C.* § 3507 ("Section 3507"), and that the Superior Court's verdict was supported by insufficient evidence identifying McMullen as the shooter who took the victim's life.

As explained below, we find no merit in either of McMullen's claims of error. Accordingly, we AFFIRM the Superior Court's decisions and judgment of conviction.

## I.    *Relevant Facts and Background*[1]

### A.  *The Murder of Darrin Gibbs*

At some point prior to November 16, 2016, McMullen and his associate, Kenton Williams ("Williams"), robbed a drug dealer named "Cos."[2] Thereafter, a rumor spread in the community that Darrin Gibbs ("Gibbs") was involved in that robbery.

Gibbs told his cousin, Keshawn Gibbs ("Keshawn"), that he had not been involved, and that he intended to tell Cos that Williams and McMullen committed the robbery.[3] On November 16, 2016, Keshawn in turn told Williams and McMullen of Gibbs's intent at a

---

[1] This recitation of the facts is drawn from the Superior Court's trial opinion, *State v. McMullen*, 2020 WL 58529 (Del. Super. Jan. 3, 2020) [hereinafter *Opinion*].

[2] *Opinion*, 2020 WL 58529, at *12.

[3] This Court uses Keshawn Gibbs's first name to distinguish him from Darrin Gibbs. No disrespect or familiarity is intended.

meeting at the Old Landing Apartments. After the meeting, McMullen told Williams that Gibbs "has gotta go."

At 11:37 p.m. that evening, video footage at the Millsboro Village Apartments, where McMullen and Gibbs both lived with their girlfriends, recorded Gibbs, McMullen, and Albert Green ("Green") leaving the area together. Green claims he broke off from the other two to buy marijuana at the nearby Brandywine Apartments, then met with McMullen and returned with him to the Millsboro Village Apartments. The video footage shows Green and McMullen returned without Gibbs at 11:55 p.m.

At approximately 11:50 p.m., a nurse and passing motorist, Michelle Wolf, stopped when she spotted Gibbs lying on his stomach on West Monroe Street near its intersection with Houston Street, 0.6 miles away from the Millsboro Village Apartments. Another motorist, Delaware correctional officer Stephen Schroeck, stopped behind her vehicle. They called 9-1-1, and police arrived within minutes. Gibbs was dead, with his hands still in his pockets. The medical examiner, Dr. Vershovsky, determined that Gibbs's death was a homicide caused by a gunshot to the back of the head.

Later that evening or early the following morning, McMullen called Williams while Williams and his friend Ashley Donaway ("Donaway") were at a Royal Farms convenience store in Georgetown, Delaware. McMullen asked Williams to come to the Millsboro Village Apartments. Williams told Donaway that they had to go to the Millsboro Village

3

Apartments to get clothes that belonged to "Little Bro."[4] Williams drove to the Millsboro Village Apartments with Donaway, picked up a bag from McMullen, then returned to the Classic Motel in Georgetown.

After they returned to the Classic Motel, Williams received a call from Tavon Baines who told him that Gibbs was dead. Williams next received another call from McMullen telling him to return to the Millsboro Village Apartments. Williams and Donaway did so, picked up McMullen, and returned to the Classic Motel. Back at the Classic Motel, McMullen told Williams "he had to do it" and that, "it was for both of us," which Williams understood to refer to killing Gibbs.[5] McMullen added, "[c]ry about it later."[6] Thereafter, Williams and Donaway returned to the Millsboro Village Apartments for a third time, and Williams picked up a vehicle (a green Scion) belonging to McMullen's girlfriend, Shernell Mills ("Mills").[7] Williams and Donaway returned to the Classic Motel in the two vehicles, after which Donaway left the motel for her mother's house.

The following day, November 17, 2016, Williams and McMullen went to the Super 8 Motel in Seaford in Mills's vehicle. On the way, they stopped to leave a duffle bag in a shed on Williams's grandmother's former property on Middleford Road, then drove over the bridge at Williams Pond. McMullen threw a black bag out of the passenger side of the

---

[4] When speaking with Donaway, Williams referred to McMullen as "Little Bro." App. to Opening Br. at A150 (Ashley Donaway's Testimony) [hereinafter "A___"], A261 (Kenton Williams's Testimony).

[5] A266; *Opinion*, 2020 WL 58529, at *12.

[6] A266 (Kenton Williams's Testimony).

[7] A267. Mills is also known as Shernell Perry. A490 (Shernell Mills's Testimony).

4

car from the bridge. McMullen told Williams the bag contained a gun. McMullen also told Williams that he had dropped a bullet at the scene, and that Green had been there.

McMullen and Williams returned to the Super 8 Motel and met up with Donaway near an Arby's in Seaford. The three returned to the Millsboro Village Apartments, Donaway in her own vehicle while McMullen and Williams were in Mills's green Scion. Once back at the Millsboro Village Apartments, Williams joined Donaway in her car, and they returned to the Super 8 Motel to check out. From there, Williams and Donaway picked up the duffle bag which contained a rifle, a banana bullet clip, and clothes. Williams discarded the clothes and returned the bag to McMullen. Later that day, Mills notified McMullen and Williams that the police were looking for them. Thereafter, Williams and McMullen went to the Millsboro Police Department and Detective Mark Csapo interviewed them.

At the scene, investigators found a single fired 9mm Hornaday shell casing five feet from Gibbs's body, an unfired 9mm Hornaday bullet approximately fifteen feet from Gibbs's body, and a Gatorade bottle. The police investigation continued thereafter, and eventually Detective Csapo interviewed Mills and Keshawn, each of whom made a voluntary statement. Detective Csapo made an audiovisual recording of the Mills interview but not the Keshawn interview. In Mills's interview, she disclosed that McMullen had told her "I killed him" and "I did it to that boy."

Also as a part of the investigation, in June 2018, Delaware State Police recovered a black handgun in a black plastic bag in Williams Pond in Seaford on the north side of the Tharp Road bridge. Forensic investigators determined that the spent casing found near

Gibbs's body was fired out of the handgun, but they were unable to determine whether or not the bullet that killed Gibbs had been fired from that same handgun. The fragments removed from Gibbs's head were of no forensic value.

### B. The Prosecution of A.J. McMullen

On October 8, 2018, a grand jury indicted McMullen on three counts, namely, Murder in the First Degree, PFDCF, and Possession of a Deadly Weapon by a Person Prohibited ("PDWBPP"). On December 4, 2019, McMullen agreed to waive his right to a jury trial without objection from the State, and the court entered an order to that effect two days later. At the start of the trial on December 9, 2019, on McMullen's motion and without objection from the State, the Superior Court severed the PDWBPP charge.

At trial, the State propounded witnesses who testified to the foregoing facts, with two main exceptions. Specifically, Keshawn's and Mills's trial testimony diverged from the content of the statements they had previously made to Detective Csapo.

In Keshawn's case, in his pre-trial statement, he told Detective Csapo that he had met with both Williams and McMullen earlier the same day that Gibbs was murdered and told them Gibbs intended to tell Cos that they were the ones responsible for the robbery. At trial, he described the meeting as being days before Gibbs's murder, being between him and Williams only, and being about Gibbs wanting to clear his own name rather than about disclosing Gibbs's intent to tell Cos about Williams's and McMullen's responsibility for the robbery.[8]

---

[8] A116–17 (Keshawn Gibbs's Testimony).

In Mills's case, her trial testimony departed from her pre-trial interview regarding McMullen's later confessions that "I killed him" and "I did it to that boy." Although she attributed those statements to McMullen in her pre-trial interview, at one point in her trial testimony, she said that McMullen never told her what happened to Gibbs.[9]

Perceiving a conflict between their trial testimony and their interview statements, the State sought to introduce Keshawn's and Mills's prior interview statements pursuant to Section 3507. McMullen timely objected in both cases, claiming that the statements were cumulative and thus inadmissible. The trial court admitted both statements over McMullen's objections.[10]

The State rested on December 12, after which McMullen moved for a judgment of acquittal, which the court took under consideration.[11] McMullen's case consisted of attacking the credibility of the State's witnesses, and suggesting alternative possibilities for who killed Gibbs, including Williams and Green, or others with whom Gibbs was involved in criminal activity.

The trial ended on December 17, and the court reserved its decision. The Superior Court issued a bench ruling accompanied by a written decision on January 3, 2020. In its decision, the Superior Court denied McMullen's motion to enter a judgment of acquittal,

---

[9] A505 (Shernell Mills's Testimony); A507.

[10] A120–21 (Keshawn Gibbs's Testimony); A516 (Shernell Mills's Testimony).

[11] A572 (Trial Transcript). The State also offered the testimony of Terry Toomey who claimed McMullen confessed to him in 2017 while they were cellmates in Sussex Correctional Institution. A366 (Terry Toomey's Testimony). The Superior Court explicitly did not rely on Toomey's testimony and referred to Toomey as a "jailhouse snitch." *Opinion*, 2020 WL 58529, at *12 ("[a]lthough some of his testimony sounded credible, I was not comfortable relying on it.").

made specific findings of fact proven beyond a reasonable doubt, and determined that under those findings of fact, McMullen was guilty of Murder First Degree and PFDCF.[12] In the Superior Court's view, the State proved that McMullen shot Gibbs in the back of the head, an act for which the only possible conclusion is that McMullen intended to kill him. It also ordered a presentence investigation and in the interim revoked McMullen's bail.[13]

On February 21, 2020, the Superior Court sentenced McMullen to life at Level V for Murder First Degree, and 25 years at Level V for PFDCF.[14]  This appeal followed.

## II.    Contentions on Appeal

McMullen appeals on two grounds.  *First*, he contends that the Superior Court erred in permitting the State to introduce Keshawn's and Mills's Section 3507 statements.  He asserts that the witnesses recalled the relevant events, that they were not contradicting their out-of-court statements, and thus their prior statements were improperly cumulative of their in-court testimony.

*Second*, McMullen argues that the Superior Court erred in denying his motion for judgment of acquittal.  In his view, the trial judge concluded that McMullen was the shooter by "erroneously harmonizing the uncorroborated testimony of multiple witnesses including an accomplice."[15]  He argues that the State's case was so reliant on Williams's testimony,

---

[12] *Opinion*, 2020 WL 58529, at *12.

[13] A744 (Bench Ruling).

[14] App. Opening Br. Ex. C (Sentence Order).

[15] Opening Br. at 14.

whom McMullen characterizes as an accomplice, as to render it insufficient for a rational trier of fact to find proof of guilt beyond a reasonable doubt.

The State counters that Mills's and Keshawn's Section 3507 statements materially differ from their trial testimony, and are not cumulative. Failing that, the State argues that any error in admitting the statements was harmless. The State further argues that Williams was not an accomplice, and that in any case, the State's case provided a broad evidentiary basis for convicting McMullen that suffices to support a conviction and defeat a motion for judgment of acquittal.

### III. Standard and Scope of Review

We review a trial judge's ruling on the admissibility of a Section 3507 statement for an abuse of discretion.[16] "An abuse of discretion occurs when a court has exceeded the bounds of reason in view of the circumstances or so ignored recognized rules of law or practice to produce injustice."[17]

"We review the denial of a motion for judgment of acquittal *de novo*."[18] The question such an appeal presents is "whether any rational trier of fact, viewing the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the State, could find the defendant guilty beyond a reasonable doubt of all the elements of the

---

[16] *Flonnory v. State*, 893 A.2d 507, 515 (Del. 2006) (citing *Johnson v. State*, 878 A.2d 422, 427 (Del. 2005)).

[17] *Hamilton v. State*, 82 A.3d 723, 726 (Del. 2013) (quoting *Collins v. State*, 56 A.3d 1012, 1018 (Del. 2012)).

[18] *Cushner v. State*, 214 A.3d 443, 446 (Del. 2019) (citing *Ways v. State*, 199 A.3d 101, 106 (Del. 2018)).

crime."[19] In making this inquiry, we do not distinguish between direct and circumstantial evidence.[20] When "'the determination of facts turns on a question of credibility and the acceptance or rejection of the testimony of witnesses appearing before him [or her], those findings of the trial judge will be approved upon review, and we will not substitute our opinion for that of the trier of fact.'"[21]

## IV. Analysis

### A. Neither Section 3507 Statement Was Cumulative

Prior to the adoption of Section 3507, the "traditional rule" was that "prior out-of-court statements [were] not admissible except for special purposes such as: admission of a prior inconsistent statement for impeachment purposes only; admission of a prior consistent statement to rebut an attack of recent fabrication or improper influence or motive for rehibilitation purposes only; and admission of a prior statement for evidence of identification."[22] In enacting Section 3507, the General Assembly departed from this common law tradition.[23] Section 3507 provides that:

> (a) In a criminal prosecution, the voluntary out-of-court prior statement of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent testimonial value.

> (b) The rule in subsection (a) of this section shall apply regardless of whether the witness' in-court testimony is consistent with the prior statement or not.

[19] *Id.*

[20] *Id.*

[21] *Mercer v. State*, 985 A.2d 390, 2009 WL 4164765, at *2 (Del. Nov. 25, 2009) (TABLE) (alteration added) (quoting *Richards v. State*, 865 A.2d 1274, 1280 (Del. 2004)).

[22] *Keys v. State*, 337 A.2d 18, 21 (Del. 1975) (alteration added) (internal citations omitted).

[23] *Id.*

10

The rule shall likewise apply with or without a showing of surprise by the introducing party.

(c) This section shall not be construed to affect the rules concerning the admission of statements of defendants or of those who are codefendants in the same trial. This section shall also not apply to the statements of those whom to cross-examine would be to subject to possible self-incrimination.[24]

However, as we noted in *Richardson v. State*, Section "3507 does not trump all other rules of admissibility."[25] Rather, it is a statutory exception to the rule against hearsay.[26] To satisfy the exception, the statement must be offered in a criminal prosecution,[27] and the State must lay a proper foundation.[28] As with any hearsay evidence, once qualifying under Section 3507's hearsay exception, the statement remains subject to all the other Delaware Rules of Evidence and other evidentiary limitations.

Among these restrictions is D.R.E. 403, which provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." "Where a

---

[24] 11 *Del. C.* § 3507.

[25] 43 A.3d 906, 909 (Del. 2012).

[26] *Downs v. State*, 206 A.3d 835, 2019 WL 1040407, at *3 (Del. Mar. 4, 2019) (TABLE); *see also* D.R.E. 801(d)(1)(C) (excluding Section 3507 statements from the definition of hearsay), 802 ("[h]earsay is not admissible except as provided by law or by these Rules").

[27] 11 *Del. C.* § 3507(a). As a departure from the common law, the statute is strictly construed. *Keys*, 337 A.2d at 22.

[28] *Id.* at 23. That foundation is necessary to afford the accused an opportunity to cross-examine the witness as to the statement and the events described in it, as required by the Confrontation Clause of the United States and Delaware Constitutions. *Richardson*, 43 A.3d at 909 ("It should be apparent, from those and many earlier precedents, that the use of § 3507 statements must be carefully circumscribed to protect defendants' constitutional rights to confront and crossexamine witnesses.") (citing *Hassan-El v. State*, 911 A.2d 385, 396 (Del. 2006)).

witness has full recall of the relevant events, and is not contradicting the out-of-court statement, the prior statement simply buttresses the in-court testimony."[29]  In *Richardson* we observed that in such circumstances, the statement would be inadmissible as cumulative.[30]  We have explained that cumulative evidence is "additional or corroborative evidence to the same point," and is "[t]hat which goes to prove what has already been established by other evidence."[31]  McMullen argues, and we agree, that the cumulativeness of a Section 3507 statement is a question governed by D.R.E. 403 under principles of general evidence law.

In this case, the record shows that each time the State offered a Section 3507 statement, the trial court carefully considered whether the prior statement had probative value over and above the content of the witness's present testimony.[32]  Moreover, the

---

[29] *Richardson*, 43 A.3d at 909.

[30] *Id.*  In *Richardson*, we commented that the interview tapes the State sought to introduce "would appear to be cumulative and subject to being excluded on that ground." *Id.*  However, because the defendant had not raised that argument, we did not base our decision on that ground.  *Id.* ("Whether the § 3507 statements were cumulative or not, we must reverse because the CAC interviewer's testimony was inadmissible and unfairly prejudicial.").

[31] *Guy v. State*, 999 A.2d 863, 870 (Del. 2010) (alteration added) (quoting Black's Law Dictionary 380 (6th ed. 1990)).

[32] In addition to Mills and Keshawn, Donaway also made a prior statement which the State sought to admit under Section 3507.  The trial court's handling of her Section 3507 statement, of which McMullen does not complain on appeal, also shows attention to the risk of cumulativeness.  On cross-examination, McMullen's attorney confronted Donaway with several details in which her testimony conflicted with the account she had given to Detective Csapo.  *E.g.,* A181–82 (Ashley Donaway's Testimony) (confronting the witness about whether she went to McDonald's and a liquor store in one trip or in two separate trips the night of the murder).  Though the contradictions were not in reference to material elements of the crimes, they tended to impeach the credibility and accuracy of her memory.  On redirect, the State sought to introduce Donaway's entire prior statement under Section 3507.  A202–03. The trial judge denied the motion, reasoning that "the whole point of 3507 is to offer testimony that is somehow different" and it is inadequate to merely show that "like all witnesses, she's got some inconsistencies in her statement." A203.  But when

12

Superior Court's written decision shows that for both Mills and Keshawn, it credited material facts contained in the Section 3507 statements but not contained in, and thus not cumulative with, the witness's trial testimony.

### 1.     Mills's Section 3507 Statement

The State sought to admit Mills's prior statement when she changed her story to deny that McMullen had confessed to her.  During her direct examination, Mills testified as follows:

> THE STATE: At some point did AJ [McMullen] tell you what happened to Darrin [Gibbs]?
>
> MILLS: No.  I started questioning him, but, no, he didn't voluntarily tell me anything in that nature.[33]

McMullen objected to introduction of Mills's Section 3507 statement on grounds of cumulativeness, asserting that Section 3507 requires a "completely contrary denial," prompting the trial court to instruct the prosecutor to "pin it down," *i.e.* more clearly demonstrate that Mills was giving a materially different account of events.[34]  The prosecutor then pressed Mills on whether she told Detective Csapo that McMullen had confessed to her, asking:  "[d]uring the interview with Detective Csapo, did you tell him

---

the State later renewed its motion in part to introduce Donaway's prior identification of "Little Bro" as McMullen, the trial judge accepted that more limited introduction.  A208–09 (Detective Mark Csapo's Testimony Containing Ashley Donaway's Prior Statement).  That is, the trial judge rejected Donaway's Section 3507 statement until the State first demonstrated that it contained a material fact not cumulative with her testimony.

[33] A505 (Shernell Mills's Testimony).

[34] A506.

that AJ told you that he had killed Darrin [Gibbs]?"[35] Mills did not answer directly, and instead, gave a long and ambiguous answer. She testified that McMullen had stated only that "yes" he understood that people were saying that he had killed Gibbs.[36] But then, at one point during her answer, Mills said:

> And I asked him did he understand, you know, what I was saying. And he answered, yes. And then after, you know, continuous questioning, I believe I did say that, you know -- and I was nervous, I was scared. And I did say -- well, he answered yes. So was it yes to, did he shoot Mr. Gibbs. And I agreed.[37]

However, upon further questioning, she did not clearly confirm whether McMullen had confessed to killing Gibbs.[38] At that point, the State renewed its request for admission of

---

[35] A507.

[36] A507–08.

[37] A507. In objecting to admission of the Section 3507 statement, defense counsel argued that, "I believe she did say and admit she made the statements. There is no contrary statement." A509.

[38] *Id*. The following exchange occurred:

> Q. During that interview with Detective Csapo, did you tell him that you asked AJ about whether he had killed the boy and was your answer that he looked you in the eye and said yes?
>
> A. That was the part of the whole argument that I asked AJ a lot of questions, all, like 15 questions in an argument state.
>
> Q. Did AJ tell you that he shot Poor Boy [Gibbs]?
>
> A. I did not remember that part until we had our last meeting when I gave the same -- what I just said. And then Mr. Hume said, well, did he say, Poor Boy. And I agreed then.

*Id*. (alteration added) We agree with the State that Mills, once again, does not respond clearly, and that this testimony can be fairly read as Mills agreeing only that McMullen has used the phrase "Poor Boy."

14

her prior statement.[39]  Finding that Mills's testimony was "confusing, hard to get a handle on, and far from clear," the trial court admitted it.[40]

Mills's Section 3507 statement and her trial testimony differed in an important way. The trial court specifically found that McMullen told Mills "I killed him" and "I did it to that boy," as Mills said in her prior statement. Yet during her testimony on the witness stand, she did not directly answer the questions about whether McMullen had made those statements and, instead, gave ambiguous responses. As we noted above, cumulativeness is a question governed by general evidence law and D.R.E. 403, and admission of the statement was a matter within the trial judge's discretion.[41]  The trial judge, sitting as the trier of fact in this bench trial, stated that he would find the Section 3507 statement helpful. The judge made clear that the purpose of admission was to see if the "prior statement may bring some clarity," and that the Superior Court would "compare the two best I can and make some judgments about that."[42]  Based upon the circumstances and record presented here, we conclude the trial judge did not abuse his discretion in concluding that the Section 3507 statement should be admitted.

---

[39] *Id.*

[40] A511.

[41] We note that D.R.E. 403 speaks of misleading the *jury*. Although the same Rules of Evidence govern bench and jury trials, when the judge is both evidentiary gatekeeper and fact-finder, the risks of confusion or unfair prejudice are less salient. *See City of Wilmington v. Flamer*, 2013 WL 4829585, at *6 (Del. Super. May 22, 2013) ("A court hearing a bench trial may relax the rules of evidence to err on the side of admissibility, 'as jury confusion in that context is not a concern.'") (quoting *PJ King Enter., LLC v. Ruello*, 2008 WL 4120040, at *3 (Del. Super. July 1, 2008)).

[42] A511 (Shernell Mills's Testimony).

## 2.    *Keshawn's Section 3507 Statement*

When seeking to admit Keshawn's prior statement to Detective Csapo, the State emphasized that his trial testimony was "not consistent with what Detective Csapo was told before."[43]   Considering his testimony, the trial court found that he "has not been able to really say much about what, if anything, happened about some other robbery involving some of the other people involved in this case."[44]   Thus, "if that's what you are going to be able to get" with the substance of Keshawn's Section 3507 statement, "that would be important."[45]   The trial court therefore admitted it.

We conclude that Keshawn's testimony differed from his Section 3507 statement in several material respects.   In his trial testimony, Keshawn denied that Gibbs had told him he knew Williams and McMullen were the true perpetrators of the Cos robbery.   He claimed that the meeting wherein he discussed the rumor occurred days prior to Gibbs's murder.   And Keshawn said the meeting was between Williams and himself only, rather than Williams, McMullen, and himself.   However, in his Section 3507 statement, Keshawn asserted that the meeting was on November 16, 2016.[46]   He claimed McMullen was at the meeting.   And he asserted that he had told McMullen and Williams of Gibbs's intent to tell the victims of the robbery who the true perpetrators were.   The trial court found that the meeting occurred as Keshawn described it in his Section 3507 statement, corroborating

---

[43] A120 (Keshawn Gibbs's Testimony).

[44] *Id.*

[45] *Id.*

[46] A122–24 (Detective Mark Csapo's Testimony Containing Keshawn Gibbs's Prior Statement).

16

Williams's account of the same meeting. Thus, the trial court credited the materially different description Keshawn gave in his statement to Detective Csapo rather than the version he provided on the witness stand. Once again, the trial court relied on material facts contained in the Section 3507 statement but not the witness's testimony, and, thus, the Section 3507 statement was not merely cumulative with that testimony.

### 3. The Form of the Statements

In his Opening Brief on appeal, McMullen raises cumulativeness as the sole basis for his claim of error as to either Mills's or Keshawn's statements.[47] In his Reply Brief, McMullen raises a new argument, namely, that Keshawn's oral statement to Detective Csapo, which the court accepted into evidence based on Detective Csapo's recollection, was an improper 'interpretive narrative' and should be excluded.[48]

Our rules are clear that "[t]he merits of any argument that is not raised in the body of the opening brief shall be deemed waived and will not be considered by the Court on appeal."[49] McMullen waived any objection to the form of the Section 3507 statements by failing to preserve the issue.[50]

---

[47] Opening Br. at 12–13.

[48] Reply Br. at 3–4 ("Here, Keshawn's statement to Detective Csapo inculpating McMullen was not recorded. Moreover, there was no mention in the record that any notes of words uttered by the witness were taken. Thus, the detective's statement is classic 'interpretive narrative' prohibited by well-established precedent.").

[49] Del. Supr. Ct. R. 14(b)(vi)(A)(3).

[50] Even if we were to consider the merits of his new argument, we would reject it, because in our prior decisions, we have noted that Section 3507 does contemplate a party propounding a testifying witness's unwritten, unrecorded prior voluntary out-of-court oral statement via the testimony of a witness who heard it. *See, e.g., Flonnory*, 893 A.2d at 526 ("In the case where the proponent of a § 3507 out-of-court statement has no recording or written statement and, therefore, must prove the

### B. There Was Sufficient Evidence to Establish Beyond a Reasonable Doubt That McMullen Caused Gibbs's Death.

McMullen argues that his conviction must be vacated and an acquittal entered because there was insufficient evidence identifying him as the shooter who killed Gibbs.[51] In his view, this was a circumstantial case comprised largely of hearsay, 3507 statements and incriminating testimony from an accomplice, and as such, it lacked an adequate foundation for the conviction. Accordingly, he contends that the Superior Court erred by denying his timely motion for judgment of acquittal and by "erroneously harmonizing the uncorroborated testimony of multiple witnesses including an accomplice."[52]

We reject McMullen's argument. An attack on the sufficiency of the evidence requires a reviewing court to view the evidence presented in the light most favorable to the State.[53] Further, "[i]n making this determination, the fact that most of the State's evidence is circumstantial is irrelevant; the Court does not distinguish between direct and circumstantial evidence."[54] Moreover, it is precisely within the province of the fact-finder to reconcile conflicting evidence if it can.[55]

---

statement through the testimony of another witness who heard the § 3507 statement, that trial testimony is also unlikely to be transcribed and given to the jury.").

[51] As the Superior Court noted in its decision, Murder First Degree requires proof of two elements, "[o]ne, the killing" and "[t]wo that the killing was done intentionally." *Opinion*, 2020 WL 58529, at *12; *see also State v. Moyer*, 387 A.2d 194, 197 (Del. 1978) (answering in the affirmative a certified question of whether Murder First Degree consists of two elements, "(1) 'intent' to cause the death of another person, and (2) causing the death of another person").

[52] Opening Br. at 14–15.

[53] *Monroe v. State*, 652 A.2d 560, 563 (Del. 1995).

[54] *Id*. (internal quotations and alterations omitted).

[55] *See Thompson v. State*, 919 A.2d 562, 2007 WL 594542, at *6 (Del. Feb. 27, 2007) (TABLE) ("An instruction to a jury to reconcile conflicting evidence, if it can, to make one harmonious story

In this case, the evidence adduced at trial was adequate to support the verdict. Evidence shows McMullen told Williams that Gibbs had "got to go" hours prior to Gibbs's death;[56] video evidence shows McMullen leaving the Millsboro Village Apartments with Gibbs minutes before the killing and returning without him minutes later;[57] and evidence shows McMullen afterwards admitted to several others that he killed Gibbs.[58] Viewing the State's case in its most favorable light as required on a motion for judgment of acquittal, the evidence establishes the elements of both Murder in the First Degree and PFDCF.

As for the Murder in the First Degree charge, the Superior Court found that McMullen killed Gibbs, and that he had a motive to kill Gibbs, namely, he wanted to keep Gibbs quiet about the robbery.[59] The court found that McMullen had the opportunity to kill Gibbs as McMullen was at the murder scene. The court also found that McMullen had

---

out of all the evidence has been given in Delaware since at least 1920.") (citing *State v. Bacon*, 112 A. 682, 684–85 (Del. Gen. Sess. 1920)).

[56] A257 (Kenton Williams's Testimony).

[57] A341–45 (Albert Green's Testimony).

[58] A266 (Kenton Williams's Testimony); A521 (Shernell Mills's Testimony). Viewing the State's case in the most favorable light, Terry Toomey's testimony also supports McMullen's later confession, even though the trial court did not rely on it. *See* note 11, *supra*.

[59] The trial court found that:

> The Defendant had a motive to kill Darrin. This was based on the testimony of Keshawn Gibbs and Kenton Williams. Kenton Williams testified that he and the Defendant stole drugs from "Cos." Keshawn Gibbs testified about hearing a rumor to that effect which also involved Darrin. Kenton Williams and Keshawn Gibbs both testified about a meeting shortly before Darrin was killed with the Defendant where it was disclosed that Darrin was going to tell the robbery victim who actually committed the robbery. After the robbery, the Defendant told Kenton Williams that "he has gotta go." The "he" was Darrin. I considered the robbery only as evidence of motive and for no other purpose.

*Opinion*, 2020 WL 58529, at *12.

19

admitted to killing Gibbs. As for the intent requirement, the court found it to be satisfied by the fact that McMullen shot Gibbs in the back of the head. It reasoned that, "[i]f you shoot someone in the back of the head with a high-powered handgun, then the only conclusion that can be drawn is that you intended to kill them."[60]

Since Gibbs's death was via a gunshot wound to the back of the head, McMullen necessarily possessed a firearm during the killing, satisfying the elements of PFDCF. As the court reasoned, given that it found that Gibbs was killed by a gunshot to his head, "the only logical conclusion -- and finding -- is that it was the Defendant who possessed the handgun that fired the bullet that killed [Gibbs]."[61] Accordingly, the court concluded that all of the required elements of PFDCF -- "a felony, a firearm, and possession of that firearm [were] met."[62] We agree with the Superior Court's conclusion that the evidence at the close of the State's case "certainly supported the finding that a reasonable fact finder could find the Defendant guilty of Murder in the First Degree and Possession of a Firearm During the Commission of a Felony."[63]

McMullen argues that based on Williams's testimony that he helped conceal McMullen's guilt after Gibbs's murder, Williams was an "accomplice" within the meaning of *Bland v. State*.[64] We reject that contention. In *Bland*, we reversed a conviction on

---

[60] *Id.*

[61] *Id.*

[62] *Id.*

[63] *Id.*

[64] 263 A.2d 286 (Del. 1970).

20

sufficiency of the evidence grounds where the conviction was based on accomplice testimony, and there was no corroboration to support the accomplice-witnesses' testimony. This Court stated that, "[d]espite the lack of any absolute requirement of corroboration of an accomplice's testimony, our Courts have always cautioned juries that, although they have the power to convict solely upon such testimony if firmly convinced of its truth, great care should be exercised in doing so."[65] We crafted a model jury instruction for future cases reliant on the uncorroborated testimony of accomplices.[66]

In *Brooks v. State*, we held that "a trial judge who fails to give an instruction about accomplice testimony commits plain error," and we said that "trial judges must give a modified version of the instruction from *Bland v. State* whenever the State offers accomplice testimony against the accused."[67] If a witness who claims to be an accomplice testifies, trial judges must give the following instruction:

> A portion of the evidence presented by the State is the testimony of admitted participants in the crime with which these defendants are charged. For

---

[65] 263 A.2d at 288.

[66] Our suggested instruction read:

> 'A portion of the evidence presented by the State is the testimony of admitted participants in the crime with which these defendants are charged. For obvious reasons, the testimony of an alleged accomplice should be examined by you with suspicion and great caution. This rule becomes particularly important when there is nothing in the evidence, direct or circumstantial, to corroborate the alleged accomplices' accusation that these defendants participated in the crime. Without such corroboration, you should not find the defendants guilty unless, after careful examination of the alleged accomplices' testimony, you are satisfied beyond a reasonable doubt that it is true and that you may safely rely upon it. Of course, if you are so satisfied, you would be justified in relying upon it, despite the lack of corroboration, and in finding the defendants guilty.'

*Bland*, 263 A.2d at 289–90.

[67] *Brooks v. State*, 40 A.3d 346, 348 (Del. 2012).

obvious reasons, the testimony of an alleged accomplice should be examined by you with more care and caution than the testimony of a witness who did not participate in the crime charged. This rule becomes particularly important when there is nothing in the evidence, direct or circumstantial, to corroborate the alleged accomplices' accusation that these defendants participated in the crime. Without such corroboration, you should not find the defendants guilty unless, after careful examination of the alleged accomplices' testimony, you are satisfied beyond a reasonable doubt that it is true and you may safely rely upon it. Of course, if you are so satisfied, you would be justified in relying upon it, despite the lack of corroboration, and in finding the defendants guilty.[68]

The Court stated that "[a] witness qualifies as an accomplice if he or she fits the definition of one, whether charged as an accomplice or not."[69] We explained that "[a]n accomplice 'is guilty of an offense committed by another person when intending to promote or facilitate the commission of the offense the accomplice aids or attempts to aid the other person in committing it.'"[70]

However, in this case, Williams was not an accomplice. Although the court found that Williams helped McMullen dispose of evidence after the murder, he was not a participant in the crimes for which McMullen was charged, namely PFDCF and Murder First Degree. Instead, at the time the State alleges McMullen killed Gibbs, the trial court found that Williams was in Georgetown with Donaway.[71] Under Delaware law, a defendant cannot for later actions be convicted as a principal or accomplice of an already-

---

[68] *Id.* at 350.

[69] *Id.* (footnote omitted).

[70] *Id*. at n.14 (quoting *Erskine v. State*, 4 A.3d 391, 394 (Del. 2010) (citing 11 *Del. C.* § 271).

[71] *Opinion*, 2020 WL 58529, at *11 (finding that "Kenton Williams has an excellent alibi," as he "was with Ashley Donaway at the time of [Gibbs's] murder.").

22

completed crime.[72]

Lastly, Williams's testimony was not uncorroborated. To the contrary, the trial court extensively described in detail the case against McMullen, and noted that one reason for crediting Williams's testimony was that it was consistent with Mills's testimony, "and the testimony of other witnesses and the forensic evidence."[73]

In sum, the State presented comprehensive physical, video, and testamentary evidence supporting the conclusion that McMullen shot Gibbs in the back of the head late in the evening of November 16, 2016, in order to conceal his prior robbery of the drug dealer Cos. The Superior Court did not err by denying McMullen's motion for a judgment of acquittal.

## V. Conclusion

For the reasons stated, the judgment of the Superior Court is AFFIRMED.

---

[72] *Harper v. State*, 121 A.3d 24, 30 (Del. 2015). In *Harper*, we explained that at common law, there was a category of criminal liability, known as "accessory after the fact," which applied to individuals who assisted criminals after they committed their criminal acts. Although federal criminal law retains accessory after the fact liability, Delaware does not. *Id*. at 30. We further explained that, "[i]n Delaware, a criminal offense is committed 'either when every element occurs, or, if a legislative purpose to prohibit a continuing course of conduct plainly appears, at the time when the course of conduct or the defendant's complicity therein is terminated." *Id*. Requiring that such legislative intent "plainly appear" is "consistent with the presumption against interpreting a criminal statute as a continuing offense." *Id*.

[73] *Opinion*, 2020 WL 58529, at *10.

VAUGHN, concurring:

I write this concurrence simply to add how I look at the defendant's argument that the witnesses' § 3507 statements should have been excluded because they were cumulative. In *Richardson v. State,* this Court wrote that where a witness testifies "in detail about the same incidents" reported by the witness in a § 3507 statement, the § 3507 statement "would appear to be cumulative and subject to being excluded on that ground . . .The statute was not intended to allow the parties to double the impact of the witness's evidence."[74]   To the extent that this means that a § 3507 statement can be excluded under Rule of Evidence 403 because it is needlessly cumulative, I agree.  As the Court stated in *Richardson,* "§ 3507 does not trump all other rules of admissibility."[75]  It appears to me, however, that some have interpreted *Richardson* as meaning that § 3507 itself requires a showing that the prior, out-of-court statement differs in some material way from the witness's in-court testimony.  For example, in this case the defendant argues that "Because 11 *Del. C.* § 3507 prohibits the introduction of an out-of-court statement when it allows a party to double the impact of the witness's evidence, the police interrogation statements implicating McMullen were inadmissible."[76]  I do not think that § 3507 contains any such qualification. All that the text of § 3507 requires is that the prior, out-of-court statement be the voluntary statement of a witness who is present at trial and subject to cross-examination.  I agree with the Majority that where an objection to the admission of a § 3507 statement is made on the

---

[74] *Richardson v. State*, 43 A.3d 906, 909 (Del. 2012).

[75] *Id.*

[76] Appellant's Op. Br. at 10.

ground that the statement is cumulative (or unfairly prejudicial), the legal authority for such an objection is Rule 403.

Rule 403 gives the trial judge broad discretion to exclude relevant evidence where its probative value is substantially outweighed by its being needlessly cumulative. That also includes broad discretion to decide that evidence is not needlessly cumulative. As the Opinion of the Court discusses in detail, no abuse of discretion has been shown in this case.